No. 14-1216

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ENERGY & ENVIRONMENT LEGAL INSTITUTE et al.,
*Appellants*,

v.

JOSHUA EPEL, in his official capacity as Commissioner of the
Colorado Public Utilities Commission, et al.,
*Appellees*,

and

ENVIRONMENT COLORADO et al.,
*Appellee-Intervenors*.

_____

On Appeal from the United States District Court for the District of
Colorado, The Honorable William J. Martínez, District Judge
No. 11-cv-00859-WJM-BNB

_____

**APPELLEE JOSHUA EPEL ET AL. AND APPELLEE-
INTERVENORS ENVIRONMENT COLORADO ET AL.'S
JOINT RESPONSE BRIEF**

_____

ORAL ARGUMENT REQUESTED

(Counsel Listed on Inside Cover)

September 24, 2014

Will V. Allen
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Colorado Judicial
Center
1300 Broadway, 10th Floor
Denver, CO  80203
(720) 508-6632
will.allen@state.co.us

*Attorney for Appellees Joshua Epel,
James Tarpey, and Pamela Patton*

Neil Levine
Neil Levine Law Office
4438 Tennyson St.
Denver, CO  80212
(303) 455-0604
nldenverlaw@gmail.com

*Attorney for Appellee-Intervenor
Solar Energy Industries
Association*

Michael S. Freeman
Michael A. Hiatt
Earthjustice
633 17th St., Suite 1600
Denver, CO  80202
(303) 623-9466
mfreeman@earthjustice.org
mhiatt@earthjustice.org

Erin Overturf
Western Resource Advocates
2260 Baseline Rd., Suite 200
Boulder, CO  80302
(303) 444-1188
erin.overturf@westernresources.org

*Attorneys for Appellee-Intervenors
Environment Colorado,
Conservation Colorado Education
Fund, Sierra Club, and The
Wilderness Society*

John E. Putnam
Kaplan Kirsch & Rockwell LLP
1675 Broadway, Suite 2300
Denver, CO  80202
(303) 825-7000
jputnam@kaplankirsch.com

*Attorney for Appellee-Intervenor
Interwest Energy Alliance*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee-Intervenors Environment Colorado, Conservation Colorado Education Fund, Sierra Club, and The Wilderness Society are nonprofit conservation organizations and they have no parent corporations, subsidiaries, or affiliates that have issued shares to the public.

Appellee-Intervenor Solar Energy Industries Association does not have a parent corporation or publicly held corporation that owns 10% or more of its stock.

Appellee-Intervenor Interwest Energy Alliance is a non-profit trade association that represents the renewable energy industry in Colorado, Arizona, Nevada, New Mexico, Utah, and Wyoming and it has no parent corporations, subsidiaries, or affiliates that have issued shares to the public.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF RELATED CASES ..................................................... xii

GLOSSARY ........................................................................................... xiii

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES ........................................................................ 2

STATEMENT OF THE CASE ................................................................... 3

I.      Factual Background ........................................................................... 3

      A.     The Colorado Renewable Energy Standard ........................... 3

      B.     Renewable Energy Standard Benefits ................................... 5

II.     Procedural Background ...................................................................... 7

ARGUMENT SUMMARY ........................................................................ 9

ARGUMENT ........................................................................................... 11

I.      Standard of Review ........................................................................ 11

II.     The Colorado Renewable Energy Standard Does Not Regulate
      Extraterritorially ............................................................................ 12

      A.     The dormant Commerce Clause ........................................... 13

      B.     The RES does not regulate extraterritorially because it
            affects only transactions with Colorado utilities and does
            not directly control any out-of-state entities ....................... 17

C.    EELI's arguments based on price control cases and a Minnesota electricity statute misread the extraterritoriality case law....................................................................25

    1.    The Supreme Court's price control cases do not control here ..................................................25

    2.    The District of Minnesota's *Heydinger* decision does not support EELI's claim...............................30

D.    EELI has provided no evidence of extraterritorial control .. 33

III.    The District Court Properly Granted Summary Judgment In Favor Of Defendants On EELI's Discrimination And *Pike* Arguments ........................................................................38

A.    EELI's general allegations of a factual dispute are insufficient to defeat summary judgment...........................38

B.    The district court's standing determination was not dispositive of any legal issue other than standing ..............41

C.    Favoring renewable energy over fossil fuels does not discriminate against interstate commerce..........................42

D.    The impacts alleged by EELI do not represent a burden on interstate commerce under *Pike*...........................46

IV.    The District Court Properly Denied EELI's Rule 56(d) Request .. 49

A.    The district court properly denied EELI's Rule 56(d) request because discovery had closed................................50

B.    EELI's request did not comply with Rule 56(d)...................53

V.    EELI Lacks Standing....................................................55

iii

A.    Alpha does not have Article III standing..............................57

    1.    The RES did not cause Alpha's lost sales ....................57

    2.    Alpha has not shown any injury based on lost ability
       to compete...................................................................... 60

B.    Rod Lueck does not have Article III standing  ....................66

CONCLUSION ........................................................69

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995) ................................................................. 65

*Alliance of Automobile Manufaturers v. Gwadosky,*
    430 F.3d 30 (1st Cir. 2005) .................................................... 34

*Alliant Energy Corporation v. Bie,*
    330 F.3d 904 (7th Cir. 2003) ................................................. 21

*Alpine Bank v. Hubbell,*
    555 F.3d 1097 (10th Cir. 2009) ............................................. 51

*American Beverage Association v. Snyder,*
    735 F.3d 362 (6th Cir. 2013) ................................................. 26

*Association des Eleveurs de Canards et d'Oies du Quebec v.*
    *Harris,* 729 F.3d 937 (9th Cir. 2013) ......................... 15, 17, 26

*Baldwin v. G.A.F. Seelig, Inc.,*
    294 U.S. 511 (1935) .......................................................... 26, 27

*Bear Lodge Multiple Use Association v. Babbitt,*
    175 F.3d 814 (10th Cir. 1999) ............................................... 68

*Braunstein v. Arizona Department of Transportation,*
    683 F.3d 1177 (9th Cir. 2012) ............................................... 61

*Brown-Forman Distillers Corporation v. New York State*
    *Liquor Authority,* 476 U.S. 573 (1986) ....................... 26, 27, 28

*C & A Carbone, Inc. v. Town of Clarkstown, New York*
    511 U.S. 383 (1994) .............................................................. 44

*Cache Valley Electric Co. v. Utah Department of*
    *Transportation,* 149 F.3d 1119 (10th Cir. 1998) .............. 12, 65

*Chamber of Commerce v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010)............................................................56

*Chavez v. New Mexico,*
    397 F.3d 826 (10th Cir. 2005)...........................................................40

*Christoffersen v. United Parcel Service, Inc.,*
    747 F.3d 1223 (10th Cir. 2014)..........................................................11

*Clapper v. Amnesty International USA,*
    133 S. Ct. 1138 (2013).....................................................................64

*Clifton v. Craig,*
    924 F.2d 182 (10th Cir. 1991)...........................................................40

*Committee to Save the Rio Hondo v. Lucero,*
    102 F.3d 445 (10th Cir. 1996)...........................................................57

*Davis v. Federal Election Commission,*
    554 U.S. 724 (2008).......................................................................56

*Day v. Bond,*
    500 F.3d 1127 (10th Cir. 2007)...................................................61, 62

*Department of Revenue of Kentucky v. Davis,*
    553 U.S. 328 (2008)...................................................................13, 14

*Exxon Corporation v. Governor of Maryland,*
    437 U.S. 117 (1978).......................................................................48

*Freedom Holdings, Inc. v. Cuomo,*
    624 F.3d 38 (2d Cir. 2010) ..............................................................34

*Freedom Holdings Inc. v. Spitzer,*
    357 F.3d 205 (2d Cir. 2004) .................................................18, 21, 47

*Gravquick A/S v. Trimble Navigation International Ltd.,*
    323 F.3d 1219 (9th Cir. 2003)...........................................................19

*Hancock v. American Telephone & Telegraph Co., Inc.,*
    701 F.3d 1248 (10th Cir. 2012)..........................................................12

*Hansen v. PT Bank Negara Indonesia (Persero)*,
706 F.3d 1244 (10th Cir. 2013) ....................................................... 11, 13

*Hartford Fire Insurance Co. v. Gandy Dancer, LLC*,
864 F. Supp. 2d 1157 (D.N.M. 2012) ..................................................... 53

*Healy v. Beer Institute*,
491 U.S. 324 (1989) ..................................................................... *passim*

*IMS Health Inc. v. Mills*,
616 F.3d 7 (1st Cir. 2010) ................................................................ 16

*Initiative & Referendum Institute v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ........................................................... 42

*Instructional Systems, Inc. v. Computer Curriculum
Corporation*, 35 F.3d 813 (3d Cir. 1994) .............................................. 22

*International Dairy Foods Association v. Boggs*,
622 F.3d 628 (6th Cir. 2010) .............................................................. 17

*Keyes v. School District No. 1*,
119 F.3d 1437 (10th Cir. 1997) ...................................................... 65, 66

*Kleinsmith v. Shurtleff*,
571 F.3d 1033 (10th Cir. 2009) ........................................................... 44

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ......................................................... 56, 60, 61, 63

*Minnesota v. Clover Leaf Creamery Company*,
449 U.S. 456 (1981) ...................................................................... 45

*National Association of Optometrists & Opticians
Lenscrafters, Inc. v. Brown*, 567 F.3d 521 (9th Cir. 2009) ................. 45

*National Paint & Coatings Association v. City of Chicago*,
45 F.3d 1124 (7th Cir. 1995) ............................................................. 49

*North Dakota v. Heydinger*,
No. 11-cv-3232, 2014 WL 1612331 (D. Minn. Apr. 18,
2014) ........................................................................ 30, 31, 32, 33

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993) ........................................................................ 60, 61, 62, 65

*Oklahoma ex rel. Doak v. Acrisure Business Outsourcing Services, LLC*, 529 Fed. App'x 886 (10th Cir. 2013) ........................... 53

*Oregon Waste System, Inc. v. Department of Environmental Quality of Oregon*, 511 U.S. 93 (1994) ........................................... 14, 43

*Pharmaceutical Care Management Association v. Rowe*, 429 F.3d 294 (1st Cir. 2005) ................................................... 18

*Pharmaceutical Research & Manufacturers of America v. Concannon*, 249 F.3d 66 (1st Cir. 2001) ....................................... 16, 21

*Pharmaceutical Research & Manufactuers of America v. Walsh*, 538 U.S. 644 (2003) ................................................... 26

*Philip Morris, Inc. v. Reilly*, 267 F.3d 45 (1st Cir. 2001) ................................................. 17

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ................................................... *passim*

*Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (10th Cir. 2008) ................................... *passim*

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978) ................................................... 60, 61

*Richards v. Combined Insurance Company of America*, 55 F.3d 247 (7th Cir. 1995) ................................................. 40

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ................................... *passim*

*Rocky Mountain Farmers Union v. Corey*, 740 F.3d 507 (9th Cir. 2014) (denial of rehearing en banc) ............... 25

*Rocky Mountain Farmers Union v. Corey*, 134 S. Ct. 2875 (2014) ........................................................ 24

*Sac & Fox Nation of Missouri v. Pierce*,
213 F.3d 566 (10th Cir. 2000) ............................................................. 61

*South Carolina Public Service Authority v. FERC*,
No. 12-1232, 2014 WL 3973116 (D.C. Cir. Aug. 15, 2014) ................. 37

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007) ......................................................... 30, 34

*United Haulers Association, Inc. v. Oneida-Herkimer Solid
Waste Management Authority*, 550 U.S. 330 (2007) ........................... 49

*United States v. Sandia*,
188 F.3d 1215 (10th Cir. 1999) .......................................................... 55

*Utah Association of Counties v. Bush*,
455 F.3d 1094 (10th Cir. 2006) .......................................................... 60

*V-1 Oil Company v. Utah State Department of Public Safety*,
131 F.3d 1415 (10th Cir. 1997) .................................................... 46, 47

*Valley Forge Christian College v. Americans United for
Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ................. 41

*Valley Forge Insurance Company v. Health Care
Management Partners, Ltd.*, 616 F.3d 1086 (10th Cir.
2010) ................................................................................................... 53

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................ 42

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ............................................................................ 42

*Wilson v. Village of Los Lunas*,
No. 13-2203, 2014 WL 3586517 (10th Cir. July 22, 2014) ..... 11, 51, 53

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
481 F.3d 1 (1st Cir. 2007) ............................................................ 19, 34

## Statutes

28 U.S.C. § 1291.................................................................................. 1

Colo. Rev. Stat. § 40-2-124
    Colo. Rev. Stat. § 40-2-124............................................................ 3
    Colo. Rev. Stat. § 40-2-124(1) ................................................ 12, 32
    Colo. Rev. Stat. § 40-2-124(1)(a) ............................................. 4, 5
    Colo. Rev. Stat. § 40-2-124(1)(c) ............................................... 5
    Colo. Rev. Stat. § 40-2-124(1)(c)(I) ...................................... 4, 18
    Colo. Rev. Stat. § 40-2-124(1)(c)(V) ..................................... 4, 18
    Colo. Rev. Stat. § 40-2-124(1)(c)(V.5) ................................... 4, 18
    Colo. Rev. Stat. § 40-2-124(1)(d) .............................................. 4, 5

## Other Authorities

Fed. R. Civ. P. 56(a) ....................................................................... 11

Fed. R. Civ. P. 56(d) .............................................................. *passim*

79 Fed. Reg. 34,830 (June 18, 2014) ............................................. 36

61 Fed. Reg. 21,540 (May 10, 1996) ............................................. 37

FERC Order No. 1000, 136 FERC ¶ 61,051 (2011)................................ 37

*California Public Utilities Commission,*
    134 FERC ¶ 61,044 (2011) ................................................... 37

2007 Colo. Legis. Serv. Ch. 60....................................................... 4

2010 Colo. Legis. Serv. Ch. 37....................................................... 4

2013 Colo. Legis. Serv. Ch. 414..................................................... 4

4 Colo. Code Regs. § 723-3-3610(c) ............................................. 6

4 Colo. Code Regs. § 723-3-3613(h) ............................................. 6

4 Colo. Code Regs. §§ 723-3-3650 to 3668 ................................. 3

4 Colo. Code Regs. § 723-3-3651 ................................................. 6

4 Colo. Code Regs. § 723-3-3652(y) ............................................................. 5

4 Colo. Code Regs. § 723-3-3654(j) ........................................................... 4, 5

4 Colo. Code Regs. § 723-3-3654(k) .......................................................... 4, 5

4 Colo. Code Regs. § 723-3-3656(e) ............................................................ 29

4 Colo. Code Regs. § 723-3-3659(n) ............................................................ 35

4 Colo. Code Regs. § 723-3-3661 ................................................................ 66

4 Colo. Code Regs. § 723-3-3662(a)(XII) .................................................... 35

4 Colo. Code Regs. § 723-3-3663 ................................................................ 32

## STATEMENT OF RELATED CASES

There are no prior or related appeals, and no related cases to this litigation involving the Colorado Renewable Energy Standard.

## **<u>GLOSSARY</u>**

| | |
|---|---|
| Alpha | Alpha Natural Resources |
| EELI | Appellants Energy & Environment Legal Institute and Rod Lueck |
| FERC | Federal Energy Regulatory Commission |
| PUC | Colorado Public Utilities Commission |
| RES | Colorado Renewable Energy Standard |

# JURISDICTIONAL STATEMENT

The district court lacked jurisdiction over the claims of Appellants Energy & Environment Legal Institute and Rod Lueck (collectively, "EELI"), who are challenging the constitutionality of the Colorado Renewable Energy Standard (the "RES").  As Appellees Joshua Epel, James Tarpey, and Pamela Patton; and Appellee-Intervenors Environment Colorado, Conservation Colorado Education Fund, Sierra Club, The Wilderness Society, Solar Energy Industries Association, and Interwest Energy Alliance (collectively, the "Defendants"), explain below, the district court erred in finding that EELI had standing to challenge the Colorado RES.  *See infra* at 55–69.[1]

The district court entered final judgment on May 12, 2014, which was appealable under 28 U.S.C. § 1291.  EELI filed a timely notice of appeal on June 2, 2014.  As discussed below, Defendants continue to challenge EELI's standing in this Court.

---

[1]     The Appellees and Appellee-Intervenors file a joint response brief in accordance with Tenth Circuit Rule 31.3.

## STATEMENT OF ISSUES

(1)    Did the district court correctly rule that the RES does not violate the dormant Commerce Clause by regulating extraterritorially, because the statute only regulates Colorado utilities and nothing in the law prevents out-of-state companies from selling either renewable or non-renewable energy in Colorado or other states?

(2)    Did the district court correctly grant summary judgment for Defendants, rejecting EELI's claims that the RES discriminates against and unduly burdens interstate commerce where EELI offered no evidence that the RES burdens or disadvantages electricity or coal produced outside Colorado, as compared to in-state production?

(3)    Did the district court properly reject a delay in considering the parties' cross-motions for summary judgment because after making a Rule 56(d) request for additional discovery during the discovery period, EELI had an opportunity for additional discovery, told the court no more discovery was needed, and did not supplement its summary judgment response?

(4)    Does EELI lack standing because: (a) the RES has not caused EELI member Alpha Natural Resources to lose coal sales and

Alpha has not been injured by an inability to compete for coal contracts;
and (b) the RES has not caused Mr. Lueck any concrete, personalized,
and actual injury?

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     The Colorado Renewable Energy Standard

This case involves Colorado's RES, which requires Colorado
utilities to generate or otherwise obtain certain quantities of electricity
from renewable sources.  Colo. Rev. Stat. § 40-2-124; 4 Colo. Code Regs.
§§ 723-3-3650 to 3668 (implementing regulations).  In 2004, Colorado
became the first state to enact a renewable energy standard by popular
referendum.  Aplt. App. at 174–88 ("Bluebook" voter guide to 2004
ballot initiative); Aplee. Supp. App. at 112.  When the RES was enacted,
sixteen other states had established similar renewable standard laws.
Aplt. App. at 177.  Today, thirty states and the District of Columbia
have mandatory renewable energy standards.  Aplee. Supp. App. at
294–95.  Colorado's RES is one of the most ambitious standards in the
nation and has helped Colorado become a national leader on renewable
energy.

Since 2004, the Colorado General Assembly has amended the law three times to increase the amount of renewable energy required, expand the types of Colorado utilities subject to the law, and increase the categories of eligible renewable energy sources.  2013 Colo. Legis. Serv. Ch. 414 (S.B. 13-252) (West); 2010 Colo. Legis. Serv. Ch. 37 (H.B. 10-1001) (West); 2007 Colo. Legis. Serv. Ch. 60 (H.B. 07-1281) (West).

The RES requires Colorado utilities to supply a percentage of their retail electricity sales from renewable energy (the "Renewable Energy Mandate").[2]  Colorado utilities comply with the RES by "generat[ing], or caus[ing] to be generated, electricity from eligible energy resources." Colo. Rev. Stat. § 40-2-124(1)(c)(I), (1)(c)(V), (1)(c)(V.5).[3]

Colorado utilities can comply with the RES by (1) directly generating or buying electricity produced by renewable sources, or (2) purchasing Renewable Energy Credits.  *Id.* § 40-2-124(1)(d); 4 Colo. Code

---

[2]     The RES requires: (1) investor-owned utilities to acquire 30% renewable energy by 2020, (2) cooperative electric associations serving 100,000 or more meters to acquire 20% renewables by 2020, and (3) cooperatives serving fewer than 100,000 meters and large municipal utilities to acquire 10% renewables by 2020.  Colo. Rev. Stat. § 40-2-124(1)(c)(I)(E), (1)(c)(V)(D), (1)(c)(V.5).

[3]     "Eligible energy resources" include wind, solar, methane captured from coal mines, and recycled energy (collectively, "renewable energy"). Colo. Rev. Stat. § 40-2-124(1)(a).

Regs. § 723-3-3654(j), (k).[4]  One credit "results from one megawatt-hour
of electric energy generated from a renewable energy resource."  4 Colo.
Code Regs. § 723-3-3652(y).  The RES's Renewable Energy Mandate is
neutral on the energy's state of origin, and it does not distinguish in any
way between in-state or out-of-state renewable electricity or credits.  *See*
Colo. Rev. Stat. § 40-2-124(1)(a), (c), (d).

## B.    Renewable Energy Standard Benefits

Colorado and twenty-nine other states have enacted renewable
energy standards because electricity generated from renewable sources
significantly benefits the electric power system, the environment, and
the economy.  Utilizing renewables has many advantages, including: (1)
increasing Colorado's energy diversity; (2) reducing the state's
vulnerability to volatile fossil fuel prices; (3) reducing air, water, and
greenhouse gas pollution; (4) reducing water consumption; and (5)
increasing the stability, reliability, and security of Colorado's electricity

---

[4]    A Renewable Energy Credit is "a contractual right to the full set of
non-energy attributes, including any and all credits, benefits, emissions
reductions, offsets, and allowances . . . directly attributable to a specific
amount of electric energy generated from a renewable energy resource."
4 Colo. Code Regs. § 723-3-3652(y).

supply.  4 Colo. Code Regs. § 723-3-3651; Aplt. App. at 179 (2004

Bluebook "arguments for" the RES).

Authoritative studies from expert federal and state agencies

confirm that generating electricity from renewable sources, rather than

fossil fuels, provides this wide array of benefits.  These benefits support

Colorado's decision and authority to adopt and expand the RES in order

to achieve the economic, environmental, and energy benefits of

generating electricity from renewable sources.  *See, e.g.*, Aplee. Supp.

App. at 115–289 (reports by the National Renewable Energy Laboratory,

Lawrence Berkeley National Laboratory, and U.S. Environmental

Protection Agency).[5]

---

[5]    In an attempt to downplay the RES's benefits, EELI notes that if
Colorado utilities comply with the RES by purchasing energy or credits
generated outside the state, the actual electricity generated from the
renewable sources may never enter Colorado.  EELI Opening Br.
("EELI Br.") at 11, 40.  But Colorado utilities and Colorado citizens still
gain many of the unique benefits from out-of-state (and in-state)
renewable energy discussed above, such as increased diversity of
Colorado's energy supply, reduced vulnerability to volatile fossil fuel
prices, and reduced air pollution from other states.  *See also* 4 Colo.
Code Regs. §§ 723-3-3610(c), 723-3-3613(h) (even without the RES, the
Colorado Public Utilities Commission may consider "insulation from
fuel price increases," environmental impacts, and price risks of future
greenhouse gas regulations, along with price when comparing different
generation resources utilities may acquire).

By creating a reliable market for renewable energy, the RES has substantially reduced the cost of wind and solar resources. For example, Xcel Energy—Colorado's largest utility—recently announced plans to purchase significant quantities of wind and solar energy above and beyond the RES's requirements. Xcel explained that it purchased this energy because wind and solar are "the most reliable and most cost-effective resources." Aplee. Supp. App. at 291.[6]

## II.    Procedural Background

Plaintiff EELI filed its lawsuit challenging the constitutionality of the RES on April 4, 2011. Aplt. App. at 14. EELI is a non-profit organization based in Washington, D.C., that promotes coal energy and disputes the existence of climate change. Rod Lueck is a co-Plaintiff and also an EELI member. Aplee. Supp. App. at 1–2.

On June 24, 2013, EELI filed a second amended complaint in light of several amendments to the RES. Aplt. App. at 60–104. The

---

[6]    Throughout its brief, EELI asserts that all electrons are fungible, implying that no relevant distinctions exist between electricity generated from fossil fuels and electricity generated from renewable sources. *See, e.g.*, EELI Br. at 10, 33, 46. EELI misses the point. While the electricity itself is identical, the environmental, economic, and other impacts from *generating* that electricity differ greatly depending on the source.

amended complaint alleges that three provisions of the RES violate the dormant Commerce Clause. *Id.* at 99–103. From June 2013 to January 2014, the parties pursued discovery and Defendants took depositions of fact and expert witnesses. During that period, all parties filed cross motions for early summary judgment. *Id.* at 34–35. Discovery closed on January 24, 2014. *Id.* at 37.

On May 1, 2014, three months after the close of discovery, the district court ruled on summary judgment that EELI had standing to challenge the Renewable Energy Mandate (Claims 1 and 2 of the amended complaint). *Id.* at 235–55. In that same order, the district court ruled that EELI did not have standing to challenge two other RES provisions addressed in the second amended complaint. *Id.* EELI has not appealed that ruling.

On May 9, 2014, the district court ended the case when it entered a second order awarding summary judgment in favor of Defendants on the merits of EELI's challenge to the RES's Renewable Energy Mandate. *Id.* at 256–78. The court ruled that (1) the RES does not violate the dormant Commerce Clause because it does not regulate extraterritorially, and (2) EELI had not offered evidence or otherwise

8

shown that the RES discriminated against or excessively burdened interstate commerce. *Id.* On June 2, 2014, EELI filed a notice of appeal. *Id.* at 281.

## ARGUMENT SUMMARY

EELI mistakenly claims that the RES violates the dormant Commerce Clause by regulating extraterritorially. The RES regulates only Colorado utilities by requiring a percentage of the electricity they sell to come from renewable sources. Out-of-state entities are free to generate electricity in whatever manner they wish, and can sell electricity to whomever they choose in Colorado and elsewhere. The RES also does not regulate extraterritorially because it only affects transactions in which a Colorado utility is a buyer, rather than wholly out-of-state transactions. In addition, EELI's argument fails because it offered no evidence showing that the RES regulates extraterritorial conduct.

EELI's argument that the district court improperly granted summary judgment on its claims that the RES discriminates against and unduly burdens interstate commerce also fails. EELI offered no

relevant evidence supporting these claims and, as a result, the district court correctly granted summary judgment.

The district court also properly rejected EELI's Rule 56(d) request to postpone ruling on Defendants' summary judgment motion. The court did not rule on the motion until nearly four months after discovery had closed, and nearly seven months after EELI made its Rule 56(d) request, thus providing EELI ample time to conduct additional discovery. Despite this time, EELI never conducted such discovery or provided the district court with additional evidence to demonstrate a genuine issue of material fact. Moreover, EELI's postponement request failed to comply with Rule 56(d)'s requirements.

Finally, the Court should affirm the dismissal of EELI's case on an alternative ground: EELI does not have Article III standing to bring its dormant Commerce Clause claims. EELI provided no evidence that the RES harmed or is harming its members. To the contrary, the evidence before the district court showed that EELI's members had not suffered any harm from the RES. Thus, the district court's summary judgment ruling dismissing EELI's claims should be affirmed.

## ARGUMENT

### I.  Standard of Review

This Court reviews *de novo* the district court's summary judgment rulings.  *Christoffersen v. United Parcel Serv., Inc.*, 747 F.3d 1223, 1227 (10th Cir. 2014).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court draws all reasonable inferences in the record in favor of the nonmoving party.  *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1247 (10th Cir. 2013).  The Court also reviews *de novo* the district court's resolution of legal issues, including dormant Commerce Clause and other constitutional questions.  *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1307 (10th Cir. 2008).

The Court reviews a district court's grant or denial of requests to postpone discovery under Federal Rule of Civil Procedure 56(d) for an abuse of discretion.  *Wilson v. Vill. of Los Lunas*, No. 13-2203, 2014 WL 3586517, at *3 (10th Cir. July 22, 2014) (unpublished).  An abuse of discretion will only be found if the court "clearly erred or ventured beyond the limits of permissible choice under the circumstances."

11

*Hancock v. Am. Tel. & Tel. Co., Inc.,* 701 F.3d 1248, 1262 (10th Cir. 2012) (quoting *Wright ex rel. Trust Co. of Kan. v. Abbott Lab., Inc.,* 259 F.3d 1226, 1233 (10th Cir. 2001)), *cert. denied,* 133 S. Ct. 2009 (2013).

Appellate courts review challenges to standing *de novo.  Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1122 (10th Cir. 1998).

## II.  The Colorado Renewable Energy Standard Does Not Regulate Extraterritorially.

EELI argues that the RES violates the dormant Commerce Clause by regulating extraterritorially.  As the district court held, however, this theory fails because the RES regulates *Colorado utilities'* retail electricity sales to *Colorado consumers*, and the RES does not require any out-of-state entities to take any action, compliance, or regulatory review.  *See* Colo. Rev. Stat. § 40-2-124(1) (statute applicable to Colorado utilities only).  Non-Colorado entities remain free to generate electricity in whatever manner they choose and to sell that electricity to whomever they wish—in Colorado and elsewhere.  *See id.*  Simply put, the RES does not regulate commerce in other states and it does not violate the dormant Commerce Clause.

12

### A.     The dormant Commerce Clause

The Commerce Clause of the U.S. Constitution grants the federal government authority to regulate interstate commerce.  U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States . . . .").  The Supreme Court has long recognized a corollary known as the dormant Commerce Clause, which generally prohibits states from enacting laws "designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).  Dormant Commerce Clause case law "is driven by concern about 'economic protectionism'" and states "retreating into . . . economic isolation." *Id.* (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996); *Limbach*, 486 U.S. at 273–74).

State laws may run afoul of the dormant Commerce Clause in three ways. *Quik Payday*, 549 F.3d at 1307.  First, laws that discriminate against commerce from other states generally violate the dormant Commerce Clause and are upheld only if they "advance[] a legitimate local purpose that cannot be adequately served by reasonable

13

nondiscriminatory alternatives." *Davis*, 553 U.S. at 338 (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99, 101 (1994)). Discrimination under the dormant Commerce Clause "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994).

Second—under what is commonly referred to as the "*Pike* test"— state laws that do not discriminate, but instead regulate evenhandedly, "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Third, a state law may violate the dormant Commerce Clause if it regulates extraterritorial commerce occurring entirely outside the state's boundaries. *Quik Payday*, 549 F.3d at 1307.

On appeal, EELI focuses nearly exclusively on its argument that the RES regulates extraterritorially. EELI Br. at 29–50.[7] The

---

[7]    Throughout its brief, EELI claims the allegedly unique features of electricity mean that state renewable statutes lie between an unavoidable "rock and a hard place," where they must necessarily either discriminate against interstate commerce or regulate

extraterritoriality doctrine prohibits states from enacting laws that "directly control[] commerce occurring wholly outside the boundaries of [the] State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see also Quik Payday*, 549 F.3d at 1307 (state cannot regulate "commerce occurring entirely outside the boundaries of the state"). When resolving an extraterritoriality claim, the Court examines whether the "practical effect of the regulation is to *control* conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336 (emphasis added).

A state law is not unconstitutional simply because it has some effect on commerce in other states. *Ass'n des Eleveurs de Canards et d'Oies du Que. v. Harris*, 729 F.3d 937, 948–49 (9th Cir. 2013) (state law is invalid only if "it *directly* regulates interstate commerce," not if it merely "affects in some way the flow of commerce between the States"). Rather, to violate the extraterritoriality doctrine, a state law must

---

extraterritorially. EELI Br. at 15–16, 37–38. EELI's metaphor creates a false choice. EELI admits the RES does not discriminate against any electricity or products from outside Colorado. *Id.* at 16 (the RES "avoids th[e] [discrimination] constitutional landmine"); *see also* Aplee. Supp. App. at 551 (EELI response to motion for summary judgment: "[EELI] has not yet argued that Claims 1 & 2 create an in-state preference or weigh in favor of in-state economic interests over out-of-state purposes . . . ."). And as discussed below, the RES does not regulate extraterritorially.

"*necessarily require*[] out-of-state commerce to be conducted according to in-state terms.'" *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 79 (1st Cir. 2001) (emphasis added) (quoting *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995)), *aff'd* 538 U.S. 644 (2003). Incidental effects on behavior in other states are not prohibited.

Because courts recognize that incidental effects on out-of-state commerce do not constitute extraterritorial regulation, "[i]n the modern era, the Supreme Court has rarely held that statutes violate the extraterritoriality doctrine." *Rocky Mountain Farmers Union v. Corey* ("*RMFU*"), 730 F.3d 1070, 1101 (9th Cir. 2013), *r'hrg denied*, 740 F.3d 507 (9th Cir. 2014), *cert. denied*, 134 S. Ct. 2875 (2014). Accordingly, the extraterritoriality doctrine has been characterized as "the dormant branch of the dormant Commerce Clause." *IMS Health Inc. v. Mills*, 616 F.3d 7, 29 n.27 (1st Cir. 2010), *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011).

EELI's extraterritoriality claim fails. The RES does not impose any *requirements* on out-of-state companies. Indeed, the RES only affects out-of-state companies that choose to enter into commercial transactions with Colorado utilities that *are* regulated by the RES. Due

16

to the RES's limited scope, EELI is unable to provide any evidence that the RES interferes with the regulatory regimes of other states, and it has not identified a single out-of-state entity that is directly regulated by the RES.

> ### B. The RES does not regulate extraterritorially because it affects only transactions with Colorado utilities and does not directly control any out-of-state entities.

EELI's argument is based on a fundamental misunderstanding of the extraterritoriality doctrine. EELI treats the doctrine as creating a broad *per se* rule against state laws that have *any* influence on commerce outside a state's borders. This is not the law.

A state law unlawfully regulates extraterritorially if it has a direct regulatory effect on *wholly* out-of-state transactions. *See Ass'n des Eleveurs de Canards*, 729 F.3d at 948–49. Conversely, a state law does not regulate extraterritorially if it "does not require that out-of-state commerce . . . be conducted according to in-state terms" and it "imposes no mandates or restrictions on other states." *Philip Morris, Inc. v. Reilly*, 267 F.3d 45, 64 (1st Cir. 2001), *aff'd*, 312 F.3d 24 (1st Cir. 2002) (en banc); *see also Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 647 (6th Cir. 2010) (state law does not regulate extraterritorially if it has

"no direct effect" on out-of-state conduct and complying with the law would not "raise the possibility" that out-of-state companies "would be in violation of the regulations of another state"); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005) (state law does not regulate extraterritorially if it does not control or "dictate the terms" of wholly out-of-state transactions).

The RES in no way regulates or directly controls entities outside Colorado. The only entities that the RES directly regulates or controls are Colorado utilities, who must meet the law's requirements for purchasing or generating minimum percentages of renewable energy. *See* Colo. Rev. Stat. § 40-2-124(1)(c)(I), (1)(c)(V), (1)(c)(V.5). All out-of-state entities are free to continue generating electricity in whatever manner they choose—whether from renewable sources or not—and to sell that electricity to whomever they please, in Colorado, their home state, or elsewhere. Because energy generators located outside Colorado "remain free to conduct commerce on their own terms, without either scrutiny or control by [Colorado]," the RES does not regulate extraterritorially. *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 221 (2d Cir. 2004). As the district court correctly summarized, "out-of-state

18

companies are free to generate electricity using whatever method they choose, can sell that electricity to whomever they choose—inside or outside of Colorado—and can do so at whatever price they choose." Aplt. App. at 272.

The RES only indirectly affects an out-of-state energy generator if a Colorado utility buys that generator's renewable energy or Renewable Energy Credits. Because such transactions necessarily involve in-state utilities, the RES does not regulate commerce occurring entirely outside Colorado. As this Court has explained, if a state law regulates a transaction that involves an in-state business or an in-state activity, the transaction "would not be wholly extraterritorial, and thus not be problematic under the dormant Commerce Clause." *Quik Payday*, 549 F.3d at 1308; *see also RMFU*, 730 F.3d at 1103 (no extraterritorial regulation when a state law regulates out-of-state entities that contract with in-state businesses); *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 15 (1st Cir. 2007) (plaintiffs must show "how the commercial activity identified is 'wholly outside' the State's boundaries"); *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003) (state law does not regulate commerce entirely out-of-state when

it "regulates contractual relationships in which at least one party is located [in-state]").

The district court correctly recognized this point: "Because the [RES] does not affect commerce unless and until an out-of-state electricity generator freely chooses to do business with a Colorado utility, it does not impermissibly control wholly out-of-state commerce." Aplt. App. at 269.

EELI claims the RES "block[s] access to a portion of the in-state market" for generators of non-renewable electricity.  EELI Br. at 34. This does not constitute extraterritorial regulation, however, because the RES does not implicate wholly out-of-Colorado activity for the reasons discussed above.[8]

At most, because it creates more demand for renewable energy and less for non-renewable energy in Colorado, the RES has an incidental impact on out-of-state entities by creating an incentive for such entities to generate renewable energy or credits for sale to

---

[8]    Tellingly, EELI cites only discrimination cases, rather than extraterritorial regulation cases, to support its argument.  EELI Br. at 34.  These discrimination cases provide no support for the assertion that the RES regulates extraterritorially.

Colorado utilities.  Courts have recognized that creating incentives that merely influence voluntary out-of-state conduct does not amount to extraterritorial regulation.  *See, e.g.*, *RMFU*, 730 F.3d at 1103 (states "are free to regulate commerce . . . within their boundaries with the goal of influencing the out-of-state choices of market participants"); *Freedom Holdings*, 357 F.3d at 211–14, 221 (regulations that created a strong incentive for cigarette manufacturers to join a settlement agreement did not regulate extraterritorially); *Pharm. Research & Mfrs.*, 249 F.3d at 71–72, 82 (creating "incentive for [out-of-state] manufacturers to enter rebate agreements" did not regulate extraterritorially).  Accordingly, as the district court here correctly ruled, "the fact that the RES may provide an incentive for out-of-state companies to conduct their business in a manner that complies with Colorado's [RES] . . . does not make the statute improper."  Aplt. App. at 270.

If the RES is unconstitutional because it has some incidental impacts outside Colorado's borders, most state regulation would be unconstitutional.  Courts have rejected this approach and recognized a state law is not unconstitutional just because it has incidental effects outside the state's borders.  *E.g.*, *Alliant Energy Corp. v. Bie*, 330 F.3d

21

904, 916 (7th Cir. 2003) ("We have no doubt that the [state law regulating financial rules for a holding companies owning Wisconsin utilities] do[es] in fact impact extraterritorial commerce . . . but we disagree with the proposition that this renders the [law] *per se* invalid."); *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir. 1994) (upholding New Jersey franchise law because "it is inevitable that a state's law . . . will have extraterritorial effects," and "[t]he Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border").  EELI's theory that the RES is unconstitutional because it has some incidental out-of-state impacts should be rejected.

The Ninth Circuit's recent decision in *Rocky Mountain Farmers Union* further demonstrates why EELI's arguments fail.  In that case, the court upheld a California renewable fuels law that lowered the average carbon content of motor vehicle fuels sold in-state.  *RMFU*, 730 F.3d at 1078–86.  Similar to the RES, the California law created an incentive for out-of-state producers to sell low carbon fuels (such as

22

ethanol). *Id.* at 1101, 1103. The court rejected the plaintiffs'

extraterritoriality challenge:

> The Fuel Standard regulates only the California market. Firms in any location may elect to respond to the incentives provided by the Fuel Standard if they wish to gain market share in California, but no firm must meet a particular carbon intensity standard, and no jurisdiction need adopt a particular regulatory standard for its producers to gain access to California.

*Id.* at 1101.

Similarly, the RES regulates only the Colorado market.

Out-of-state firms may choose to respond to the RES's incentive to

produce renewable energy, but no out-of-state firm must produce

qualifying renewable energy or adopt any regulatory standards to

gain access to the Colorado market. Like the California law, the

RES does not regulate extraterritorially.

EELI attempts to distinguish *Rocky Mountain Farmers

Union* on the grounds that ethanol is a tangible product while

electricity is not. EELI Br. at 46. This is a distinction without a

difference. Neither the California law at issue in *Rocky Mountain

Farmers Union* nor the RES regulates extraterritorially because

both laws regulate only in-state entities. Out-of-state entities are

23

free to sell their products in-state without any restrictions under these two state laws.  The fact that the RES regulates electricity sales, rather than a more tangible product, does not change this essential fact.

EELI's criticisms of *Rocky Mountain Farmers Union* are similarly without merit.  First, EELI's unexplained claim that the decision conflicts with "centuries of well-established Supreme Court jurisprudence," *id.*, is incorrect, as evidenced, in part, by the Supreme Court's recent denial of certiorari.  *Rocky Mountain Farmers Union v. Corey*, 134 S. Ct. 2875 (2014).

Moreover, the *Rocky Mountain Farmers Union* dissents cited by EELI are inapplicable here.  *See* EELI Br. at 47–48.  Judge Murguia's dissent from the panel decision is irrelevant because it disagreed with the majority's holding on discrimination against interstate commerce, rather than the majority's extraterritoriality ruling.  *RMFU*, 730 F.3d at 1108 n.2 (Murguia, J., concurring in part and dissenting in part).

Judge Smith's dissent from the denial of rehearing en banc stated that he would have ruled that the law controlled out-of-

24

state commerce by "penalizing certain out-of-state practices."

*Rocky Mountain Farmers Union v. Corey*, 740 F.3d 507, 518 (9th

Cir. 2014) (en banc) (M. Smith, J., dissenting from denial of

rehearing en banc).  But as Judge Smith made clear, the

California law "penalized" out-of-state ethanol producers, as

opposed to in-state producers, by assigning out-of-state ethanol a

higher "carbon intensity" score.  *Id.* at 513, 518.  In Colorado,

however, the RES does not contain similar "penalties" for out-of-

state practices.  EELI only alleges that the RES discriminates

against a *type* of electricity (fossil fuel-generated power), in favor

of renewable energy, *regardless of where the power is generated*.

**C.    EELI's arguments based on price control cases and a
        Minnesota electricity statute misread the
        extraterritoriality case law.**

EELI's extraterritoriality argument relies heavily on inapplicable

cases.

1.    <u>The Supreme Court's price control cases do not control
      here</u>.

As the foundation of its extraterritoriality argument, EELI relies

on the Supreme Court's statement in price control cases that a state

"may not project its legislation into other states."  EELI Br. at 16, 22,

25

31, 38; *Healy*, 491 U.S. at 337; *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582–83 (1986); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935). These cases all involved state laws that effectively dictated the prices of commercial transactions in other states by linking in-state prices to out-of-state prices. *See, e.g.*, *Healy*, 491 U.S. at 337–38 (Connecticut price affirmation law "ha[d] the practical effect of controlling Massachusetts prices").[9] Although EELI insists that these decisions "control" the resolution of this case, they are readily distinguishable from the RES. *See* EELI Br. at 27, 29, 40–41, 48.

As an initial matter, the rule in *Baldwin*, *Brown-Forman*, and *Healy* is limited to state price control laws. The Supreme Court has recognized that when a state law does not control out-of-state pricing, "[t]he rule that was applied in *Baldwin* and *Healy* . . . is not applicable." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003); *see also Eleveurs*, 729 F.3d at 951 (same); *Am. Beverage Ass'n v. Snyder*,

---

[9]    Price affirmation laws require distributors to affirm that the prices charged in the home state are or will be no higher than the lowest prices charged in any other state. Prospective price affirmation in one state thus has a direct legal effect on pricing in the other states. *See Healy*, 491 U.S. at 331–40.

735 F.3d 362, 373 (6th Cir. 2013) ("The Supreme Court has applied the extraterritoriality doctrine only in the limited context of price-affirmation statutes.").  Because the RES in no way dictates the price of any energy transactions outside of Colorado, *Baldwin*, *Brown-Forman*, and *Healy* are inapplicable.

The RES is also distinguishable from the price fixing laws in those cases for other reasons.  In *Baldwin*, a New York law set minimum prices to be paid to in-state milk producers and prohibited the sale of out-of-state milk purchased at a lower price.  294 U.S. at 519.  The law was unconstitutional because it set "barrier[s] to traffic between one state and another as effective as . . . customs duties" and effectively regulated the prices paid to milk producers in other states, meaning it limited competition between the states.  *Id.* at 521–22, 524.  In *Brown-Forman*, a New York liquor price affirmation law "project[ed] its legislation" into other states, because its practical effect was to (1) "effectively *force*" liquor distributors to change their business practices in other states, and (2) "*force*" other states to change their regulatory schemes.  476 U.S. at 584 (emphases added).  And in *Healy*, a Connecticut price affirmation statute had "the practical effect of

27

*controlling* Massachusetts prices" and "*preventing* brewers from undertaking competitive pricing in Massachusetts." 491 U.S. at 338 (emphases added).

The RES causes none of these prohibited impacts. As the district court explained, the RES "does not limit [electricity] transactions, set minimum standards for out-of-state generators that wish to do business in Colorado, or attempt to control pricing of the electricity." Aplt. App. at 269. *Brown-Forman* and *Healy* might apply if the RES *prohibited* the sale of energy into Colorado that does not count toward RES compliance, or if it required out-of-state transactions to be conducted on the same price terms as in-state transactions. But the RES has no such mandates.[10]

---

[10]     EELI also quotes *Brown-Forman* to support its argument that it is "constitutionally irrelevant" that the RES applies only to Colorado utilities and their in-state retail electricity sales. EELI Br. at 34. However, in *Brown-Forman*, the Court explained that the price affirmation law at issue there regulated extraterritorially *because* it had the effect of regulating transactions occurring in other states between wholly out-of-state entities. 476 U.S. at 583–84; *see also id.* at 581 ("[T]he most important issue [i]s whether the statute regulate[s] out-of-state transactions"). In contrast, the RES has no impact on transactions between exclusively out-of-state entities.

EELI claims the RES regulates energy generators in other states by defining the types of renewable resources Colorado utilities can use for RES compliance.  EELI Br. at 35–37.  But the fact that only certain forms of energy count toward RES compliance does not equate to extraterritorial control of out-of-state energy generators.  To use one of EELI's examples, a hypothetical Utah coal mine that generates electricity from coal mine methane can sell that energy to a Colorado utility (or any non-Colorado entity) regardless of whether the project qualifies as renewable energy under the RES.  That energy may be more valuable to a Colorado utility if it can be used for RES compliance, but the RES does not regulate the prices paid for the energy or otherwise control the Utah entity's business decisions.  The same is true for large hydropower and ocean power generators in California, and every other out-of-state business.[11]

---

[11]     EELI incorrectly suggests that this hypothetical Utah coal mine methane generator must go through Colorado Public Utilities Commission ("PUC") review and approval before it can sell renewable energy to a Colorado utility for RES compliance.  EELI Br. at 35.  The PUC's regulations make clear that it is Colorado utilities—not out-of-state entities—that seek PUC approval of in-state and out-of-state renewable energy or credits used for RES compliance.  4 Colo. Code

Rewriting the extraterritoriality doctrine in the manner EELI proposes would put numerous state laws on perilous constitutional footing due to the pervasive interstate nature of modern commerce. The Second Circuit has explained: "Were we to accept [plaintiff's extraterritoriality] theory, almost every state consumer protection law would be considered 'protectionist' in a sense prohibited by the Constitution. The meaning of the dormant Commerce Clause is far narrower." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007).

    2.    <u>The District of Minnesota's *Heydinger* decision does not support EELI's claim</u>.

Much of EELI's extraterritoriality argument rests on the Minnesota district court opinion in *North Dakota v. Heydinger*, No. 11-cv-3232 (SRN/SER), 2014 WL 1612331 (D. Minn. Apr. 18, 2014) (appeal pending). EELI Br. *passim*. That case is readily distinguishable.

*Heydinger* involved a Minnesota law prohibiting the importation of out-of-state power from certain fossil fuel-fired power plants that would contribute to the Minnesota power sector's carbon pollution.

Regs. § 723-3-3656(e); *see also* Aplt. App. at 272 (district court order rejecting similar argument).

2014 WL 1612331, at *3.  The *Heydinger* court determined the law applied not just to Minnesota utilities, but also to out-of-state power plants selling power to non-Minnesota states.  *Id.* at *22–23.

The court explained that when out-of-state power plants sold power to buyers who were also outside Minnesota, some of that energy could enter Minnesota due to the interstate nature of the electricity grid.  *Id.* at *22 ("[W]hen a non-Minnesota entity injects electricity into the grid to satisfy its obligations to a non-Minnesota member, it cannot ensure that the electricity will not travel to and be removed in . . . Minnesota.").  If such power entered Minnesota, the court ruled that the fossil fuel generators would be in violation of the Minnesota law by contributing to Minnesota's carbon pollution.  *Id.* at *23.  It found that the law's plain language applied to utilities located both within Minnesota and beyond its borders.  *Id.* at *3, *13–15 (statutory text broadly stated that "no person shall . . . import or commit to import from outside the state power").  Accordingly, out-of-state entities entering into out-of-state transactions with other non-Minnesota

entities were forced to comply with the Minnesota law or risk legal action.  *Id* at *23.[12]

The RES is not analogous to the Minnesota law.  Unlike in Minnesota, out-of-state entities cannot violate the RES and they face no legal liabilities in Colorado based on their out-of-state actions.  The RES makes clear that the law only applies to Colorado utilities, and not to non-Colorado utilities selling electricity that may enter Colorado.  Colo. Rev. Stat. § 40-2-124(1) (only a "provider of retail electric service in the state of Colorado . . . is a qualifying retail utility" subject to the law's requirements); 4 Colo. Code Regs. § 723-3-3663 (discussing "compliance penalties" that only apply to Colorado utilities).  Whereas *Heydinger* held that the statutory phrase "no person shall" meant that the Minnesota law could be applied to non-Minnesota entities and transactions taking place entirely outside Minnesota, the RES does not

---

[12]    While the fact that electrons on the electricity grid cannot be precisely controlled and tracked may have been consequential in *Heydinger*, it has no impact on this case.  *See* EELI Br. at 11, 40.  This was relevant in *Heydinger* because it meant that entirely out-of-state electricity transactions could inadvertently send electrons into Minnesota, subjecting out-of-state entities to possible legal liability in Minnesota.  Here, this issue is irrelevant because regardless of where electrons ultimately flow, under the RES, no out-of-state entities are subject to Colorado controls or potential legal liabilities in Colorado.

regulate out-of-state entities.  The RES applies only to Colorado
utilities.

### D.  EELI has provided no evidence of extraterritorial control.

As discussed above, the plain language of the RES amply
demonstrates that it does not regulate extraterritorially.  But
summary judgment was proper for another reason: EELI was
required to offer evidence that the RES directly controls out-of-
state entities or out-of-state transactions, or that the RES creates
a conflict with similar laws in other states.  *See PT Bank Negara
Indonesia*, 706 F.3d at 1247 (summary judgment for defendant
proper where plaintiff fails to offer evidence supporting element of
claim).  Yet EELI offered no evidence supporting its
extraterritoriality arguments, and thus failed to meet its burden
of showing that a genuine issue of material fact exists.

To succeed, a plaintiff must provide specific evidence of
extraterritorial regulation.  *See, e.g.*, *Heydinger*, 2014 WL
1612331, at *4–8, *21–23 (discussing detailed declarations
explaining concrete impacts on out-of-state entities).  Mere
speculation about a law's possible extraterritorial effects does not

33

suffice. *Quik Payday*, 549 F.3d at 1308 (rejecting claim when plaintiff "failed to show that this possible extraterritorial effect of the statute is more than speculation" and "provided no evidence" of out-of-state control).

A "bare claim" of extraterritorial regulation "fails to pass muster," because "[t]his sophisticated area of law requires developed argumentation, with evidentiary support." *Wine & Spirits Retailers*, 481 F.3d at 15. Plaintiffs cannot "simply label state statutes [as extraterritorial] and assume that judicial condemnation will follow." *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 65 (2d Cir. 2010); *see also SPGGC*, 505 F.3d at 194 (rejecting extraterritoriality claim when plaintiff made only unsupported "bald assertion" of extraterritorial control); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 41 (1st Cir. 2005) (rejecting extraterritoriality claim that was not supported by sufficient evidence).

EELI complains that the district court "dramatically understated the practical extraterritorial effects of the RES," EELI Br. at 39, but its extraterritoriality claims are based on

34

nothing more than speculation, hypotheticals, and bald assertions. At no point has EELI identified a single actual out-of-state company or transaction that the RES directly controls or regulates. EELI provides only hypothetical examples of allegedly extraterritorial control involving a theoretical coal mine methane generator in Utah and theoretical hydropower and ocean thermal generators in California. EELI Br. at 18–19, 35–37. EELI's hypothetical examples are insufficient to support its claim. The lack of concrete evidence—and the statute's plain text—show that the RES does not regulate extraterritorially.[13]

EELI also makes the dire prediction that "the current marketplace for electricity would come to a grinding halt" if other states enact similar laws. EELI Br. at 33 (quoting *Heydinger*, 2014 WL

---

[13] The only concrete example EELI offers of extraterritorial control is a Colorado utility called the Intermountain Rural Electric Association, which has purchased out-of-state hydropower Renewable Energy Credits that it cannot use for RES compliance. EELI Br. at 36. But this example does not show any extraterritorial regulation because it involves a *Colorado utility*, rather than an out-of-state entity that the RES allegedly controls. Moreover, while the utility cannot use those hydropower credits for RES compliance, it can still sell and trade these credits to entities in other states where they will count toward compliance. *See* 4 Colo. Code Regs. §§ 723-3-3659(n), 723-3-3662(a)(XII).

1612331, at *24).  But EELI provides no evidence to support its claim.
In fact, the undisputed evidence in the record shows that thirty states
across the nation already have enacted renewable energy standards
that complement, rather than conflict with, each other.  *See supra* at 3,
5–6.  These standards work in concert, allowing each state to increase
renewable energy in the manner that best suits local circumstances.
*See, e.g.*, 79 Fed. Reg. 34,830, 34,866 (June 18, 2014) (state renewable
standards reflect each state's "own policy objectives and assessments of
feasibility and cost").  EELI offers no evidence to suggest otherwise.

The U.S. Environmental Protection Agency recently endorsed the
states' renewable standards as critical "building blocks" for a proposed
federal rule to limit carbon pollution from fossil fuel-fired power plants.
*Id.* at 34,849, 34,866–70, 34,901, 34,922.  The federal agency
responsible for regulating electricity transmission and the electric grid
also does not view the state laws as problematic.  The Federal Energy
Regulatory Commission ("FERC") recently stated that "states have the
authority to dictate the generation resources from which utilities may
procure electric energy," and confirmed that rates may reflect "state
requirement[s] that utilities purchase their energy needs from, for

36

example, renewable resources." *Cal. Pub. Utils. Comm'n*, 134 FERC ¶ 61,044, ¶ 30 (2011); *see also* FERC Order No. 888, 61 Fed. Reg. 21,540, 21,626 n.544 (May 10, 1996) (FERC "will not affect or encroach upon state authority . . . over utility generation and resource portfolios"). In fact, FERC recently ordered that interstate electric transmission providers accommodate state renewable standards by adding transmission capacity that will facilitate increased renewable energy generation. FERC Order No. 1000, 136 FERC ¶ 61,051, ¶¶ 1–2, 82, 203 (2011); *see also S.C. Pub. Serv. Auth. v. FERC*, No. 12-1232, 2014 WL 3973116 (D.C. Cir. Aug. 15, 2014) (upholding FERC Order No. 1000).

EELI's unsupported allegations do not create a genuine issue of material fact as to whether the RES and similar laws elsewhere cause the type of "competing and interlocking" regulations that the extraterritoriality doctrine prohibits. *See Healy*, 491 U.S. at 337. Accordingly, the district court correctly granted Defendants' summary judgment motion.

## III. The District Court Properly Granted Summary Judgment In Favor Of Defendants On EELI's Discrimination And *Pike* Arguments.

EELI argues the district court erred when it granted summary judgment in Defendants' favor on the merits of EELI's discrimination and *Pike* claims. EELI Br. at 58–61. EELI claims it cited information demonstrating that there were material facts at issue, or that the "law of the case" somehow required the court to find the RES had a discriminatory effect. *Id.* These arguments fail because EELI failed to identify any specific facts that could defeat summary judgment. Moreover, as the district court determined, the law applicable to the discrimination and *Pike* claims supports the opposite of what EELI argues. Aplt. App. at 265–66, 273–77.

### A. EELI's general allegations of a factual dispute are insufficient to defeat summary judgment.

In the district court, both EELI and Defendants requested summary judgment in their favor on Claims 1 and 2. Aplee. Supp. App. at 62–68, 80–94. The district court granted Defendants' motion and pointed out that EELI "made no attempt to identify specific facts showing that there is a genuine issue for trial." Aplt. App. at 266. This observation was well-supported by the record: in opposing Defendants'

38

summary judgment motion, EELI appeared to state that alleged discrimination was not before the court.  Aplee. Supp. App. at 547 ("There are four ways a state law can cause this kind of violation. For Claims 1 & 2, [EELI] only argues only [sic] one form of violation—an extraterritorial violation.").  EELI instead appeared to argue that judgment in favor of Defendants on EELI's *Pike* and discrimination theories was "premature and [EELI] respectfully suggests that this section of their argument is not sufficient or appropriate to support denying [EELI's] first two claims."  *Id.* at 551.[14]

Reversing course on appeal, EELI now claims that it *did* present evidence to the district court on the issues of discrimination and the *Pike* test.  EELI Br. at 59–60.  Accordingly, EELI seems to confess that the issues were appropriate for district court consideration *and* that EELI presented its factual and legal arguments.  Tellingly, however,

---

[14]    Oddly, while claiming that discrimination arguments were "not before the Court," Aplee. Supp. App. at 548, EELI *itself* sought summary judgment on that basis.  *Id.* at 57–58; *see also* ECF No. 192 at 13 (EELI reply brief arguing "The Renewable Energy Mandate Discriminates Against Interstate Commerce").  EELI's request for judgment on its discrimination theory undercuts its argument to this Court that issues of fact precluded summary judgment.  In any event, EELI's argument in the district court was based on a legal theory that misconstrued applicable precedent.  *See infra* at 42–46.

EELI primarily points to its response to Defendants' motion for summary judgment on *standing*—not on the merits. *See id.* (citing generally to Plaintiffs' Response to Defendants' Early Motion for Summary Judgment on Standing (ECF No. 194)). EELI's reliance on its separate standing filing illustrates its failure in the district court to offer any material evidence addressing the discrimination and *Pike* issues.

Moreover, EELI does not identify for this Court any specific facts that would have precluded summary judgment. Instead, EELI now relies on its "previous filings" (its response to Defendants' standing motion) to show that genuine issues of material fact existed about discrimination and the *Pike* test. *Id.* at 59.

This passing reference does not merit reversal. Appellate courts typically will not supply arguments or scour the record for error. *Chavez v. New Mexico*, 397 F.3d 826, 839 (10th Cir. 2005); *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995). Instead, EELI must identify the specific disputed material facts that precluded summary judgment. *See Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991) (party must identify specific factual evidence to avoid the entry of

summary judgment).  EELI's general reference neither demonstrates an issue of material fact, nor shows the district court misapprehended any such issue.  The district court's entry of summary judgment was therefore appropriate and should be affirmed.

### B.   The district court's standing determination was not dispositive of any legal issue other than standing.

EELI also argues that because the district court found it had standing to challenge the Renewable Energy Mandate, the "law of the case" is that the RES is discriminatory.  EELI Br. at 60.  However, the district court's standing ruling involved a different legal standard than the merits of EELI's claims, and did not exempt EELI from demonstrating genuine issues of material fact on the merits.

Article III of the U.S. Constitution gives federal courts jurisdiction over "cases and controversies," and serves to identify disputes which are appropriately resolved through the judicial process.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–76 (1982).  In a case such as this one, courts deciding standing do not ask if the alleged injury "rises to the level of a constitutional violation," but instead determine only "if there was an injury in fact, caused by the challenged action and redressable in court."

41

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006).  That threshold standing inquiry is in no way dispositive of the merits of a plaintiff's claim.  *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (standing determination "in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal").

Accordingly, the district court did not decide the legal issues of discrimination or *Pike* burden under the dormant Commerce Clause when it found EELI had standing to maintain Claims 1 and 2 of its lawsuit, and EELI's argument fails.  EELI makes no other assignment of *legal* error as to the grant of summary judgment in Defendants' favor on EELI's discrimination and *Pike* claims.

### C. Favoring renewable energy over fossil fuels does not discriminate against interstate commerce.

If the Court reaches the merits of the district court's decision on discrimination, the applicable facts and law are clear that the RES does not violate the dormant Commerce Clause by "discriminating" against fossil fuel-generated electricity in favor of renewable energy.  The dormant Commerce Clause bars economic protectionism between states—not between different products.  "Discrimination" in the

42

dormant Commerce Clause context "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99. The relevant discrimination for dormant Commerce Clause purposes is "differential treatment of in-state and out-of-state economic interests," not differential treatment of certain goods or services. *Id.*

EELI did not present evidence of any impacts from the RES that qualify as discrimination in effect. EELI does not dispute that fossil fuel generating plants outside Colorado are not burdened relative to their Colorado counterparts. *See* Aplt. App. at 62, 75; Aplee. Supp. App. at 297–98. Nor does EELI claim that the RES treats renewable energy generators outside Colorado differently from those in this state. To the contrary, EELI explicitly stated that the "RES' practical effect has been to allow utilities to use out-of-state renewable generation to meet the Colorado renewable quotas." Aplee. Supp. App. at 63. Moreover, EELI's own expert witness concluded that out-of-state electricity producers have *improved* their competitive position in Colorado since the RES's enactment, claiming out-of-state energy providers have supplied an *increasing* share of Colorado's electricity since the RES was

43

enacted.  *Id.* at 33; Aplt. App. at 275–76 (citing Michaels Expert Report at 28–29, 65).

Nor can EELI offer evidence of discrimination against coal producers outside Colorado, as the undisputed record evidence showed that since the RES was implemented, out-of-state coal has supplied an *increasing* share of the Colorado market compared to in-state coal suppliers.  Aplee. Supp. App. at 33–34, 102.

There were thus no disputed issues of material fact that precluded summary judgment: the RES does not discriminate against interstate commerce in practical effect.  *See Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1043 (10th Cir. 2009) (plaintiff could not show discrimination in practical effect when he not only failed to show that in-state attorneys were doing work formerly done by out-of-state attorneys, but out-of-state attorneys were doing *more* work than previously); *cf. C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390–94 (1994) (striking down state law because its "practical effect and design" prevented out-of-state firms from entering the local market).

Instead of presenting evidence that the RES discriminated against companies outside Colorado, EELI argues that *any* reduction *in the*

44

*market for fossil fuels* is discrimination against interstate commerce. EELI Br. at 59–60; Aplee. Supp. App. at 549–50. This theory is contrary to Supreme Court precedent, which holds that a reduction in the market of one product in favor of another is not discrimination against interstate commerce if the state law treats in-state and out-of-state participants the same. In *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), the Court determined that a state law *completely banning* one type of product (milk sold in nonreturnable plastic containers) in favor of another product (milk sold in paperboard cartons) was non-discriminatory where it applied equally to in-state and out-of-state interests. *Id.* at 471–72.

Similarly, the RES treats in-state and out-of-state interests evenhandedly. Like the product ban in *Clover Leaf Creamery*, the RES simply favors one product (renewable energy) over another (fossil fuels), and its evenhanded treatment is therefore not discriminatory. *See also RMFU*, 730 F.3d at 1087–1100 (upholding California law preferring low carbon fuels over high carbon fuels); *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009) (states "may prevent businesses with certain structures or methods of

45

operation from participating in a retail market without violating the dormant Commerce Clause").

Evidence about impacts to coal producers or fossil fuel power plants does not create a genuine issue of material fact regarding whether the RES discriminates against interstate commerce. The district court properly granted summary judgment on this claim.

**D.    The impacts alleged by EELI do not represent a burden on interstate commerce under *Pike*.**

For similar reasons, the district court correctly granted summary judgment on EELI's *Pike* claim. EELI argues that the RES imposes an impermissible burden on interstate commerce by reducing the market for coal producers. EELI Br. at 58, 60–61. That impact, however, does not represent a burden on interstate commerce within the meaning of the *Pike* test.

Not all costs resulting from a state law implicate the dormant Commerce Clause. A state law may fail the *Pike* test only if it imposes a burden that falls disproportionately on commerce from other states relative to in-state commerce. In *V-1 Oil Company v. Utah State Department of Public Safety*, 131 F.3d 1415 (10th Cir. 1997), the Tenth Circuit explained:

> The incidental burdens of the *Pike* inquiry are the burdens on interstate commerce that *exceed* the burdens on *intrastate* commerce.  Such incidental burdens might also include the disruption of [interstate] travel and shipping due to a lack of uniformity in state laws, impacts on commerce beyond the borders of the defendant [S]tate, and impacts that fall more heavily on out-of-state interests.

*Id.* at 1425 (emphases added; internal quotation marks and citations omitted); *see also Freedom Holdings*, 357 F.3d at 217 (under *Pike*, "[t]he statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce").  The district court correctly described this differential impact as the "critical inquiry" for the *Pike* test. Aplt. App. at 274.

The RES's impact on the coal industry is not a cognizable burden on interstate commerce under *Pike,* because any alleged burden does not fall more heavily on out-of-state coal producers than it does on Colorado producers.  As noted above, EELI's own expert report suggests the opposite is true: out-of-state coal producers have actually *increased*

47

their Colorado market share since the RES took effect.  *See supra* at 43–44.[15]

The fact that coal producers and electric utilities are engaged in interstate commerce does not make any and all laws affecting those companies a dormant Commerce Clause issue.  In *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978), the Supreme Court held that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another."  *Id.* at 127.  *Exxon* explained that the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."  *Id.* at 127–28; *see also RMFU*, 730 F.3d at 1092 ("[T]he dormant Commerce Clause does not guarantee that . . . producers may compete on the terms they find most convenient.").  While the RES may cause electricity generation to shift from coal companies to wind farms, that impact does not pose a burden on interstate commerce within the

---

[15]    Other alleged impacts EELI identified associated with the RES—such as costs to Colorado consumers, effects on Colorado's electricity reliability, or effects on birds and bats in Colorado—are in-state effects that also do not fall within the *Pike* burden analysis.

meaning of the *Pike* test: like coal-fired power, wind and other renewable resources are involved in interstate commerce.

Moreover, courts have long cautioned against using the *Pike* balancing test as license for a roving judicial inquiry into the wisdom of state laws. Today, "[i]nterstate communication and transportation is pervasive," and most companies—in almost any industry—do business across state lines. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130 (7th Cir. 1995). As a result, "almost every state and local law" affects goods and services that may be in interstate commerce to some extent. *Id.* The dormant Commerce Clause should not be used "to rigorously scrutinize economic legislation passed under the auspices of the police power." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007). EELI asks this Court to do just that. The costs EELI alleges are not burdens to interstate commerce within the meaning of *Pike*, and the district court's grant of summary judgment for Defendants should be affirmed.

## IV. The District Court Properly Denied EELI's Rule 56(d) Request.

EELI suggests that the district court abused its discretion when it denied EELI's request under Federal Rule of Civil Procedure 56(d) to

delay resolution of Defendants' summary judgment motion regarding

their discrimination and *Pike* arguments.  EELI Br. at 50–58.  Rule

56(d) states that if a party opposing summary judgment shows "by

affidavit or declaration that, for specified reasons, it cannot present

facts essential to justify its opposition, the court may: (1) defer

considering the motion or deny it; (2) allow time to obtain affidavits or

to take discovery; or (3) issue any other appropriate order."

The district court's denial of EELI's Rule 56(d) request was proper

and not an abuse of discretion.

### A.  The district court properly denied EELI's Rule 56(d) request because discovery had closed.

EELI had ample opportunity to conduct additional discovery and

to supplement its summary judgment response, but it chose not to do so.

EELI made its Rule 56(d) postponement request in October 2013—three

months before the January 24, 2014 discovery cutoff.  Aplt. App. at 215–

18.  The district court ruled on summary judgment nearly seven months

later, in May 2014.  *Id.* at 256.  In that time period, EELI did not

request discovery of any type or seek to supplement its summary

judgment response.  Thus, EELI was not deprived of the opportunity to

develop facts to oppose that motion.  The Tenth Circuit has repeatedly

50

upheld denials of Rule 56(d) relief for this reason. *See, e.g.*, *Wilson*, 2014 WL 3586517, at *3–4 (district court did not abuse its discretion when it decided summary judgment motion months after Rule 56(d) request and after sufficient time to take additional discovery); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1114 (10th Cir. 2009) (summary judgment appropriate when "[a]ll the discovery referred to in [defendants'] Rule 56[(d)] motions had been completed" and defendants "made no attempt to provide the district court with evidence from the new depositions that would support their opposition to summary judgment").

Consistent with *Wilson* and *Alpine Bank*, the district court properly denied EELI's request to delay resolution of the summary judgment motion:

> [M]ore than six months have passed since [EELI's] brief was filed. In that time, discovery has closed. However, despite the fact that [EELI] ha[s] repeatedly called additional legal authority to the Court's attention, they have not sought leave to supplement their response to Defendants' Motion with any additional evidence obtained in discovery. As such, the Court sees no reason to defer ruling on any aspect of Defendants' Motion.

Aplt. App. at 265 (parentheticals omitted). Moreover, in a status conference held in February, 2014, shortly after the discovery cut-off,

the magistrate judge asked specifically about the need for any

additional discovery.  In response, EELI's counsel confirmed that

discovery was complete and EELI did not need any additional fact-

finding:

> THE COURT:    Is it -- is it accurate that all the
> discovery is done and no matter what the rulings are on the
> pending dispositive motions and others that might be filed,
> you'll be ready for a final pretrial conference within a
> reasonable time after those rulings so that there wouldn't be
> anymore discovery, no more experts, no more anything like
> that?
>
> MR. SCHNARE:    That's correct.  Discovery has ended.

Aplee. Supp. App. at 571.

In its appeal brief, EELI does not dispute that it never submitted

additional evidence to the district court, took additional discovery, or

even raised its outstanding Rule 56(d) request after the close of

discovery.  *See* EELI Br. at 50–58.  Accordingly, the district court did

not abuse its discretion in denying EELI's Rule 56(d) request and

correctly ruled on the cross-motions for summary judgment, rather than

delaying their resolution.[16]

---

[16]    EELI claims that because it filed a Rule 56(d) request, it could
have waived its "rights" had it "fully engaged with Defendants' *Pike*

## B.    EELI's request did not comply with Rule 56(d).

Rule 56(d) requests must be crafted to identify what specific facts and discovery merit a delay in ruling on a summary judgment motion. EELI's affidavit did not meet these requirements.  The Tenth Circuit requires a party seeking Rule 56(d) relief to identify: (1) the probable facts not available, (2) why those facts cannot be presented at the time of the motion, (3) the steps taken to obtain these facts, and (4) how additional time will enable the party to obtain the facts and rebut the motion for summary judgment.  *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010).  Courts have refused Rule 56(d) requests when parties fail to comply with these requirements.  *E.g.*, *Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC*, 529 Fed. App'x 886, 892–93 (10th Cir. 2013) (summary judgment proper when Rule 56(d) affidavits did not "describe why the facts could not have been presented or what steps were taken to obtain the facts"); *Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 864 F. Supp.

---

arguments" in its response to Defendants' summary judgment motion. EELI Br. at 55.  However, the Tenth Circuit has held exactly the opposite: When filing a Rule 56(d) request, the party must still respond fully to the merits of a pending summary judgment with the evidence at hand.  *Wilson*, 2014 WL 3586517, at *4.

2d 1157, 1191 (D.N.M. 2012) ("Rule 56([d]) may not be invoked based

solely upon the assertion that discovery is incomplete or that the

specific facts necessary to oppose summary judgment are unavailable.").

EELI's Rule 56(d) request did not satisfy these requirements. *See*

Aplt. App. at 215–18. EELI failed to identify the specific evidence it

allegedly needed and did not explain why additional time was

necessary. Instead, the affidavit offered *legal* argument that summary

judgment was premature. *Id.* at 216–17. And, while EELI's supporting

affidavit generally discussed its desire for discovery, it did not identify

exactly what information was not available to it at the time or why it

could not supply the information through affidavits. In its only specific

request, EELI claimed that more time was necessary for EELI to depose

Defendants' expert witnesses, speculating that Defendants' experts

would provide unspecified evidence necessary to support EELI's case.

*Id.* However, EELI never explained why its own expert witnesses could

not provide the same information. And, despite the assertions in the

Rule 56(d) affidavit, *EELI never requested to depose any of Defendants'*

*experts*.

54

Thus, EELI's affidavit did not provide a sufficient basis for Rule 56(d) relief and the district court properly denied EELI's request.[17]

## V.     EELI Lacks Standing.

The district court's rejection of EELI's claims should also be affirmed because EELI does not have standing to challenge the RES. *See United States v. Sandia*, 188 F.3d 1215, 1217 (10th Cir. 1999) (Court is "free to affirm . . . on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court").

Article III of the U.S. Constitution establishes jurisdiction for federal courts to hear "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  The "irreducible constitutional minimum" to establish standing is:

---

[17]     The district court also properly denied EELI's request for Rule 56(d) relief because EELI failed to follow the applicable local rules requiring it to file a separate motion requesting such relief.  Aplt. App. at 265.  EELI's response to Defendants' summary judgment motion mentioned Rule 56(d) and included an affidavit discussing Rule 56(d), but EELI never filed a motion requesting Rule 56(d) relief.  Both Local Rule 7.1 and Judge Martínez's Practice Standards require litigants to file separate, written motions whenever they ask the district court to take any action or grant any relief.  D.C. Colo.LCivR 7.1(d); Aplee. Supp. App. at 580.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

The party bringing the lawsuit has the burden of proof to establish each element of standing for each claim. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010). Plaintiffs' burden to establish standing is elevated at the summary judgment stage of a case. *Lujan*, 504 U.S. at 561 ("plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'").

For an organization like EELI to establish standing, it must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to [its] purpose; and (c) neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 n.3 (10th Cir. 1996) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Although the second and third elements of organizational standing are undisputed, EELI cannot meet the first requirement. As detailed below, the members upon which EELI relies to support its standing—Alpha Natural Resources ("Alpha") and Rod Lueck—do not have standing themselves.

## A.    Alpha does not have Article III standing.

In the district court, EELI alleged that the RES injures Alpha—an international mining company that owns two coal mines in Wyoming—in two ways: (1) by decreasing Alpha's coal sales in Colorado, and (2) by harming Alpha's ability to compete for a portion of the Colorado market for power plant fuels. Aplt. App. at 243. Neither alleged injury supports EELI's standing.

### 1.    The RES did not cause Alpha's lost sales.

As the district court correctly ruled, the undisputed facts show the RES has not caused Alpha's lost sales. Aplt. App. at 243. Alpha's only coal customer in Colorado is Xcel Energy, a utility subject to the RES.

Prior to 2009, Alpha's Wyoming mines supplied 100 percent of the coal used at two Xcel power plants in Colorado.  Aplee. Supp. App. at 4, 103–05.  Since 2009, Xcel's coal purchases from Alpha for those two power plants have decreased significantly.  *Id.* at 105.

However, Xcel has stated that the RES has not caused Xcel to purchase less coal from Alpha.  According to Xcel, it bought less Alpha coal because Alpha's competitors supply coal more cheaply.  *Id.* at 309 ("Since 2009, Alpha's competitors have offered our Comanche and Pawnee power plants coal at prices that are lower than Alpha's.").  Xcel specifically stated that the RES has "not caused or contributed to Xcel buying less coal from Alpha than in years past."  *Id.*

In addition, Alpha also refused to attribute its loss of Colorado sales to the RES.  Alpha conceded it "has not performed or received an analysis to determine the impact of the Colorado Renewable Energy Standard on the production or sale of coal produced by [Alpha]."  *Id.* at 4 (parenthetical omitted).  Moreover, Alpha has "not made any determination whether or not coal production or sales by Alpha . . . have been or will be reduced or otherwise adversely impacted due to the operation and effects of the RES."  *Id.*

As the district court concluded, EELI offered no evidence to dispute Xcel's and Alpha's statements. Aplt. App. at 243. Nor did EELI offer evidence connecting the RES and Alpha's lost coal sales.[18]

Similarly, EELI failed to create a genuine issue of material fact about the causation and redressability requirements for standing. EELI's injury was caused by price competition from other coal companies rather than by the RES. For the same reason, EELI also cannot demonstrate that a court order invalidating the RES would remedy any loss in sales. Alpha's reduced coal sales cannot provide a basis for EELI's standing.

---

[18]    EELI based its claim of injury to Alpha's coal sales on assertions made by EELI's former executive director, Thomas Tanton. *See, e.g.*, Aplt. App. at 223–24; Aplee. Supp. App. at 517–40. When Mr. Tanton was deposed, however, these statements proved to be wholly speculative and without foundation. Aplee. Supp. App. at 537–38; *see also id.* at 523 ("I don't know if their sales process includes contracts or just invoices and delivery. So I don't know if they had contracts that were canceled or not renewed, I don't know their process for selling coal."); *id.* at 524–25 (Mr. Tanton did not consider any alternative reasons for his opinion about Alpha's reduced coal sales, including that Xcel was buying coal from Alpha's competition at lower prices).

2.   <u>Alpha has not shown any injury based on lost ability to compete</u>.

The district court relied on EELI's allegation that the RES prevents the coal industry as a whole from competing for a portion of the Colorado electricity market when it found that Alpha had standing. Aplt. App. at 243–45.  The record, however, fails to support this claim or the many steps in the causal chain necessary to do so.

When it ruled Alpha suffered a competitive injury, the district court relied on cases decided in the context of the Constitution's Equal Protection Clause.  *Id.* at 244.[19]  In these cases, the Supreme Court recognized injury to a party's ability to compete on an equal basis as a basis for standing.  *See, e.g.*, *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).  For example, in *Northeast Florida Chapter*, the Supreme Court ruled that in equal protection cases, "the 'injury in fact' is the inability to compete on an equal footing in the

---

[19]   The district court committed legal error by relying on mere allegations at the summary judgment stage that Alpha has lost an opportunity to compete.  Aplt. App. at 243–45.  EELI was required to provide evidence, and not rely on mere allegation, to support its claim that Alpha is unable to compete.  *See Lujan*, 504 U.S. at 561; *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1100 (10th Cir. 2006).

60

bidding process." 508 U.S at 666. Similarly, in *Bakke*, the court held that the injury stems from the university's "decision not to permit Bakke to compete for all 100 places in the class, simply because of his race." 438 U.S. at 280 n.14.

These cases do not control here because EELI has not shown any actual, concrete, or particularized injury *to Alpha*, as opposed to the fossil fuel industry as a whole. An alleged injury must be "concrete and particularized" and "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 & n.1; *see also Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) (same). Even in the equal protection cases, "the plaintiff still must show that the challenged discriminatory criterion was, in fact, the barrier that disadvantaged his or her ability to obtain benefits." *Day v. Bond*, 500 F.3d 1127, 1133 (10th Cir. 2007); *see also Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1185 (9th Cir. 2012) (particularized injury requirement "applies with as much force in the equal protection context as in any other"). Accordingly, only those "personally denied" equal treatment can demonstrate standing and an injury-in-fact. *Braunstein*, 683 F.3d at 1185 (finding plaintiff "has not provided any evidence" that agency

program "affected him personally or that it impeded his ability to compete for utility location work on an equal basis"); *see also Day*, 500 F.3d at 1134 (finding injuries were speculative and not concrete or particularized). For example, a plaintiff alleging an equal protection claim must show "that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Ne. Fla. Chapter*, 508 U.S at 666.

EELI, however, offered no evidence that Alpha suffered an injury to its ability to compete: EELI did not identify a single Alpha contract that was cancelled because of the RES, EELI did not specify any coal contracts Alpha sought to compete for other than its existing contracts with the two Xcel facilities, and EELI did not explain how the RES harmed Alpha's efforts to bid or compete. To the contrary, Alpha competes freely in the Colorado energy-generating market, and Alpha itself stated that it has no basis to conclude that the RES impaired its business or "will reduce[] or otherwise adversely impact[]" its sales in Colorado. *See supra* at 58. EELI thus offered no evidence showing Alpha suffered a particularized competitive injury.

The absence of any competitive injury particular to Alpha is highlighted by the fact that coal-fired electricity generation in Colorado actually *increased* since the RES was enacted. EELI's own expert explained that despite the RES, *the total volume of coal used for electricity generation in Colorado has increased* in recent years because of an increase in overall electricity demand. Aplee. Supp. App. at 33–34. While the size of the coal market in Colorado has grown, notwithstanding the RES, Alpha has not increased its sales. *Id.* at 104. This contrast shows that while Alpha has as much or more ability to compete since the RES was enacted, it is simply losing sales to competitors in the coal industry. *See id.* at 105.[20]

More broadly, the record fails to support the multiple steps necessary to establish causation. Alpha does not compete directly for the percentage of electricity supply affected by the RES. Instead, it is fossil fuel power plants that compete for this market—Alpha is just a potential fuel supplier to those power plants. Moreover, not only coal-

---

[20]     For that reason, a court order striking down the RES would not redress the alleged injury to Alpha. *Lujan*, 504 U.S. at 561 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'").

fired plants, but also natural gas plants, would compete for the fossil fuel generation that is displaced by the RES.

Thus, to create an issue of fact as to whether the RES has caused Alpha a competitive injury, evidence would be required that in the absence of the RES: (1) coal-fired plants would sufficiently outcompete natural gas (or hydroelectric or other forms of generation) at sufficient levels to create new sales opportunities for Alpha, and (2) that Alpha would overcome its current lack of price competitiveness in the market for coal sales in Colorado.  There is no such evidence in the record. Alpha thus lacks the requisite "particularized" injury to support EELI's standing.

Not only has EELI failed to show any "actual" competitive injury to Alpha, it also has not demonstrated that any such injury is "imminent."  A future injury must be "*certainly impending*" and "'[a]llegations of *possible* future injury' are not sufficient."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Whitmore*, 495 U.S. at 158).  To successfully demonstrate this standing requirement, a plaintiff must show it is able and ready to compete for particular contracts and the challenged law prevents it from doing so on an equal

basis. *Ne. Fla. Chapter*, 508 U.S at 666; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (plaintiff must establish that "it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors"); *Cache Valley Elec.*, 149 F.3d at 1122 (finding injury imminent because company provided evidence that two contracts had been "lost as a result of the [agency] program"). As detailed above, EELI did not—and cannot—make this required showing for an imminent future injury.

This case is more akin to *Keyes v. School District No. 1*, 119 F.3d 1437 (10th Cir. 1997), than the equal protection cases upon which the district court relied. In *Keyes*, the plaintiffs challenged the constitutionality of a busing provision adopted to desegregate Denver's public school system. This Court found claims of possible future injury inadequate to demonstrate standing where plaintiffs did not show they were currently being affected:

> [Plaintiffs] have failed to demonstrate that the School District or any school has withdrawn policies, instituted policies, or refrained from withdrawing or instituting policies as a result of the Busing Clause. Consequently, any injury flowing from the application of the Busing Clause constitutes possible future injury, not past or present injury. Appellants thus lack standing.

65

*Id.* at 1445–46 (footnotes omitted).  As in *Keyes*, the evidence here does not show that the RES has deprived or will deprive Alpha of the opportunity to compete for particular coal sales in Colorado.

### B.     Rod Lueck does not have Article III standing.

EELI also relied on its member Rod Lueck to establish standing. Mr. Lueck is a Colorado resident and part-owner of Techmate, a Colorado computer company serving the financial services industry. Aplee. Supp. App. at 1–2, 330–33, 338–42.  Xcel supplies Techmate's office with electricity.  *Id.* at 331–32, 372, 424.  At the direction of Mr. Lueck, Techmate installed and paid for solar panels and backup systems in case of power outages.  *Id.* at 375–421.  Mr. Lueck also alleged the RES caused Techmate's electricity rates to increase because of a small Renewable Energy Standard Adjustment fee to recover Xcel's RES costs, which was included on Techmate's electricity bills.  *Id.* at 372; *see also* 4 Colo. Code Regs. § 723-3-3661 (retail rate impact regulations).  Mr. Lueck lives at the Techmate office, having recently moved there after selling his family home.  Aplee. Supp. App. at 330–33.

In its ruling, the district court evaluated—and correctly

66

rejected—each of Mr. Lueck's alleged economic and aesthetic injuries.

Aplt. App. at 248–52. In particular, the court found that the economic

injuries were not particular to Mr. Lueck. At his deposition, Mr. Lueck

testified that RES-related expenses he allegedly incurred had

"probably" been paid by Techmate, rather than by him. Aplee. Supp.

App. at 418; *see also id.* at 409, 416–17 (same). As the district court

ruled, "there appears to be a lack of proof regarding whether Mr. Lueck

personally pays any [Renewable Energy Standard Adjustment] fee" on

Techmate's Xcel bills. Aplt. App. at 248.

Similarly, Mr. Lueck's original declaration filed in this case stated

that *Techmate* purchased an electric generator to address alleged

concerns about unreliable electric service. Aplee. Supp. App. at 1

("Techmate . . . has had to purchase and operate an emergency

generator so that . . . Techmate can still service its clients."). And at his

deposition, Mr. Lueck testified that he was "pretty sure [the electrical

backup equipment] was paid out of the company because it was for

company property." *Id.* at 409. The court thus found it "questionable

whether this purchase [for backup generation] constituted an injury to

Mr. Lueck personally, rather than his business." Aplt. App. at 249. Mr.

67

Lueck failed to establish an economic injury-in-fact to permit EELI's challenge to the RES.

EELI also alleged the RES had caused an injury to Mr. Lueck's aesthetic interests because he does not like the sight of wind turbines and he is concerned they kill birds and bats. Aplt. App. at 250; Aplee. Supp. App. at 314. These allegations, however, were not supported. As the district court concluded, "there is a lack of proof supporting this purported injury." Aplt. App. at 250. Mr. Lueck explained that rather than personally witnessing impacts to birds and bats, he had "only heard reports from farmers" and "read on-line . . . studies." Aplee. Supp. App. at 465. The court correctly ruled that "this evidence is insufficient to prove an injury to birds or bats in the area near Mr. Lueck's family property." Aplt. App. at 251. The court also concluded that "[w]ith regard to an injury to the vistas near Mr. Lueck's property, there is similarly a failure of proof of an injury in the record." *Id.*

Accordingly, EELI has failed to demonstrate with supporting evidence that the RES causes Mr. Lueck to suffer any actual injury. *See Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 821 (10th Cir. 1999) ("The party invoking federal jurisdiction bears the burden of

establishing these elements and of coming forward with evidence of specific facts which prove standing."). Consequently, Mr. Lueck does not support EELI's standing.

## CONCLUSION

For the reasons stated above, the Colorado RES does not violate the dormant Commerce Clause and EELI does not have standing. Accordingly, the Court should affirm the district court's judgment.

Respectfully submitted September 24, 2014,

> JOHN W. SUTHERS
> Attorney General
>
> s/ *William V. Allen*
> William V. Allen
> Assistant Attorney General
> Colorado Department of Law
> Civil Litigation & Employment Law
> Section
> Ralph L. Carr Colorado Judicial Ctr.
> 1300 Broadway, 10th Floor
> Denver, CO  80203
> (720) 508-6632
> will.allen@state.co.us
>
> *Attorney for Appellees Joshua Epel,*
> *James Tarpey, and Pamela Patton*

s/ *Michael S. Freeman*
Michael S. Freeman
Michael A. Hiatt
Earthjustice
633 17th St., Suite 1600
Denver, CO 80202
(303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
mhiatt@earthjustice.org

Erin Overturf
Western Resource Advocates
2260 Baseline Rd, Suite 200
Boulder, CO 80302
(303) 444-1188
Fax: (303) 786-8054
erin.overturf@westernresources.org

*Attorneys for Appellee-Intervenors*
*Environment Colorado, Conservation*
*Colorado Education Fund, Sierra*
*Club, and The Wilderness Society*

s/ *Neil Levine*
Neil Levine
Neil Levine Law Office
4438 Tennyson St.
Denver, CO  80212
(303) 455-0604
nldenverlaw@gmail.com

*Attorney for Appellee-Intervenor Solar*
*Energy Industries Association*

<u>s/ *John E. Putnam*</u>
John E. Putnam
Kaplan Kirsch & Rockwell LLP
1675 Broadway, Suite 2300
Denver, CO  80202
(303) 825-7000 Phone
(303) 825-7005 Facsimile
jputnam@kaplankirsch.com

*Attorney for Appellee-Intervenor*
*Interwest Energy Alliance*

## ORAL ARGUMENT STATEMENT

This case presents fundamental issues regarding the authority of states under the dormant Commerce Clause to require minimum percentages of electricity generation from renewable energy sources. Because resolution of these issues could have far-reaching consequences, Appellees and Appellee-Intervenors believe that oral argument may assist the Court in its deliberations and respectfully request oral argument.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,796 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010, Century Schoolbook, 14-point font.


Date: September 24, 2014                    s/ Michael S. Freeman
                                            Michael S. Freeman
                                            Earthjustice
                                            633 17th St., Suite 1600
                                            Denver, CO  80202
                                            (303) 623-9466
                                            mfreeman@earthjustice.org

                                            *Attorney for Appellee-Intervenors*
                                            *Environment Colorado,*
                                            *Conservation Colorado*
                                            *Education Fund, Sierra Club,*
                                            *and The Wilderness Society*

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that:

(1)     all required privacy redactions have been made pursuant to 10th Cir. R. 25.5;

(2)     if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program Kaspersky Endpoint Security 10, Version 10.2.1.23(a), Sept. 24, 2014, and, according to the program, are free of viruses.


<u>s/ Michael S. Freeman</u>

74

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2014, I electronically filed

the foregoing **JOINT RESPONSE BRIEF** with the Court's CM/ECF

system which will send notification of such filing to the following:

David W. Schnare, schnare@fmelawclinic.org
Michael David Pepson, michael.d.pepson@gmail.com
William Allen, will.allen@state.co.us
Neil Levine, nlevine@grandcanyontrust.org
John E. Putnam, jputnam@kaplankirsch.com
Erin A. Overturf, erin.overturf@westernresources.org


Date: September 24, 2014                  <u>s/ Michael S. Freeman</u>
                                          Michael S. Freeman
                                          Earthjustice
                                          633 17th St., Suite 1600
                                          Denver, CO  80202
                                          (303) 623-9466
                                          mfreeman@earthjustice.org

                                          *Attorney for Appellee-Intervenors*
                                          *Environment Colorado,*
                                          *Conservation Colorado*
                                          *Education Fund, Sierra Club,*
                                          *and The Wilderness Society*