No. 14 – 1216

_____

# United States Court of Appeals
# For the Tenth Circuit

_____

ENERGY & ENVIRONMENT LEGAL INSTITUTE, ET AL.,
*Plaintiffs-Appellants*

v.

JOSHUA EPEL, ET AL.
*Defendants-Appellees*

_____

On Appeal from the United States District Court for the
District of Colorado (Martinez, J.)
Civil Case No. 1:11-cv-00859-WJM-BNB

_____

## APPELLANTS' REPLY BRIEF

_____

David W. Schnare
FREE MARKET ENVIRONMENTAL LAW
CLINIC
9033 Brook Ford Rd.
Burke, VA 22015
schnare@fmelawclinic.org
571-243-7975

Michael D. Pepson
14108 FLINT ROCK TERRACE
ROCKVILLE, MD 20853
301-980-2693
michael.d.pepson@gmail.com

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................2

   I.   E&ELegal meets the Standings requirements ..................................2

   II.   The RES's Renewable Energy Mandate Necessarily Constitutes Either an Unconstitutional In-State Set Aside or Regulates Extraterritorially. ..............5

   III. The Scope and *Stare Decisis* of the Extraterritoriality Doctrine is not in Question. .....................................................................................13

       A.   The Supreme Court has not reversed or narrowed the *stare decisis* of the Extraterritoriality Doctrine..............................................14

       B.   The Scope of the Extraterritoriality Doctrine Reaches beyond State Price Control Regulation........................................................20

   IV. The RES is Discriminatory and harms Interstate Commerce ......................21

   V.  *Pike* Balancing was Premature .................................................21

CONCLUSION.......................................................................................25

CERTIFICATE OF COMPLIANCE........................................................27

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS.28

CERTIFICATE OF SERVICE .................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Alpine Bank v. Hubbell*, 555 F.3d 1097 (10th Cir. Colo.2009) ........................ 23, 24

*American Beverage Ass'n v. Snyder*, 735 F.3d 362 (6th Cir. 2012) ................. 14, 18

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)............................................23

*Association des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937 (9th Cir. 2013)........................................................................................ 14, 15, 17

*Baldwin*, 294 U.S. 511 (1939) ............................................................... 9, 10, 11, 13

*Bibb v. Navajo Freight Lines, Inc*., 359 U.S. 520 (1959).......................................19

*BMW of N. Am. v. Gore*, 517 U.S. 599 (1996) ........................................................19

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) .......................................................................................................... passim

*Citizens United v. FEC*, 558 U.S. 310 (2010).................................................. 15, 16

*Clinton v. City of New York*, 424 U.S. 417 (1998) ...................................................2

*Edgar v. Mite Corp*., 457 U.S. 624 (1982) ...................................................... 17, 19

*EPA v. EME Homer City Generation, L.P.* 134 S. Ct. 1584 (2014)........................9

*Exxon Corp. v. Governor of Maryland*,437 U.S. 117 (1978) .................................20

*Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248 (10th Cir. 2012)...................24

*Healy v. Beer Inst*., 491 U.S. 324 (1989)......................................................... passim

*Keyes v. School District No. 1*, 119 F.3d 1437 (10th Cir. 1997)..............................4

*Kleinsmith v. Shurtleff*, 571 F.3d 1033 (10th Cir. 2009) ........................................20

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490 (7th Cir. 2005)..................................................................................................3

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..............................................................9

*Montejo* v. *Louisiana,* 556 U.S. 778 (2009) ............................................................15

*N.E. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993)......................................................................................2, 3

*National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999)..........8, 12

*New York v. FERC*, 535 U.S. 1 (2002) ...................................................................13

*Nichols v. Markell*, C.A. No. 12-777-CJB, 2014 U.S. Dist. LEXIS 52976 (D. Del. Apr. 17, 2014) ..........................................................................................3

*North Dakota v. Heydinger*, No. 11-cv-3232, 2014 U.S. Dist. LEXIS 53888 (D. Minn. 2014)............................................................................................11

*Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012) ..........................................3

*Pharm. Research & Mfrs. of Am. V. District of Columbia*, 406 F. Supp. 2d 56 (D.D.C. 2005)..............................................................................................8

*Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003).............. 14, 15, 16

*Quik Payday, Inc. v. Stork*, 549 F.3d 549 (10th Cir. 2008) ..................................8, 9

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)..........................................3

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ............11

*Rocky Mountain v. Corey*, 740 F.3d 507, 519 (9th Cir. 2014) ...............................14

*S. Pac. Co. v. Arizona*, 325 U.S. 761 (1945) ................................................... 17, 19

*Schutz v. Wyoming*, 2003 U.S. Dist. LEXIS 26518, 11-13 (D. Wyo. 2003), *aff'd* 415 F.3d 1128 (10th Cir. 2005) ..........................................................3

*Wright ex rel. Trust Co. of Kan. v. Abbott Lab., Inc.,* 259 F.3d 1226 (10th Cir. 2001) ........................................................................................................24

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ........................................................3, 5

**Statutes**
C.R.S. 40-1-124(1)(c)(I) ........................................................................................6, 7

**Other Authorities**
FERC Order No. 1000, 136 FERC ¶ 61,051 (2001)................................................13

**Rules**
F.R.C.P Rule 56(d)................................................................................. 1, 22, 23, 24

## INTRODUCTION

As a practical matter, we brought this case to prevent the premature death of 250 Colorado citizens each year – this is the "putative local benefit" of the Colorado Renewable Energy Standard (RES) (Opening Brief at 57.).  This explains the gravity we attach to this appeal.  As a matter of law, this case is one normative response to what Intervenor Sierra Club calls its "War on Coal."  According to their U.S. Internal Revenue Service annual filings, the Sierra Club and its Foundation have expended <u>multiple hundreds of millions</u> of dollars attempting to shut down the coal industry.  It worked intimately with Colorado to get the renewable energy statute passed and it now defends that law as part of its continuing war on this industry.  While the Sierra Club may wage any war it wishes against coal companies, coal miners and coal miners' daughters, the State of Colorado may not.

The gravamen of this case is the undisputed fact that Colorado has set aside a portion of the interstate market for electricity and regulated the production processes that may be used to supply that market, regulations that apply on both sides of the state's borders.  As a matter of law, this single fact establishes the basis for standing, the statute's extraterritoriality effect and its discriminatory effect.  We reply on each of these issues in turn and end with a reply on the failure to properly apply Rule 56(d) by the court below.

# ARGUMENT

## I.    E&ELegal meets the Standings requirements

Just as the statute cuts coal-fired electric generation out of a portion of the interstate market for electricity, it also cut coal itself out of a portion of the interstate market for fuels used to generate electricity and for the interstate market for coal.  Following Supreme Court precedent, the Court below found that the renewables "set-aside program" established all the facts necessary to support standing.

> Plaintiffs have sufficiently alleged an injury in fact. Plaintiffs have shown that the Renewables Quota prevents Alpha—as a coal producer—from being able to compete for 30% of the energy market. Plaintiffs need not show that Alpha would actually have won any contract for this 30% of the market; the loss of the ability to compete is the injury.

*See* Appellants' Opening Brief (hereinafter Opening Brief) at ATT-10.  Supreme Court precedents control this Article III standing question.  *N.E. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding that contractors had shown an injury due to inability to compete for contracts set aside for minority-owned businesses); *see also Clinton v. City of New York*, 424 U.S. 417, 433 (1998) ("[p]robable economic injury resulting from [governmental actions] that alter competitive conditions" satisfy the injury-in-fact requirement of Article III")(citations omitted), *and*, *Regents of Univ. of Cal. v.*

2

*Bakke*, 438 U.S. 265, 280-81 (1978).[1]  *See also Petrella v. Brownback*, 697 F.3d 1285, 1294 (10th Cir. 2012) ("unequal treatment … constitutes the injury); *Schutz v. Wyoming*, 2003 U.S. Dist. LEXIS 26518, 11-13 (D. Wyo. 2003), *aff'd* 415 F.3d 1128 (10th Cir. 2005).

Colorado makes much of the fact that coal sales <u>in the state</u> have increased and thus coal producers cannot show a loss of opportunity to sell coal. The question is not, however, as to coal sales within Colorado, but coal sales in the interstate market used to generate electricity.

Further, "Defendants admit that coal has lost some market share as an electricity generation source in Colorado [and] [a]dmit that wind energy increased its market share by some amount over the same period." Doc. No. 187 p. 6-7 (¶

---

[1] Colorado contends that this line of cases applies only to claims brought under the Equal Protection Clause. The Court below rejected that assertion and properly noted that "the case law does not support this argument." *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497-98 (7th Cir. 2005) (noting that the holdings in *N.E. Fla.* and *Baake* regarding injury for purposes of standing are "not limited to cases alleging a violation of the Equal Protection Clause."). "Whether to apply this analysis depends on the nature of the alleged injury, not the source of the asserted right." *Id*. (citing *Lujan*, 504 U.S. at 576 ('[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.'))." *And see*, *Nichols v. Markell*, C.A. No. 12-777-CJB, 2014 U.S. Dist. LEXIS 52976, *34-40 (D. Del. Apr. 17, 2014) (court applied *N.E. Fla.* and related case authorities to find standing to bring a dormant Commerce Clause challenge against Delaware's Renewable Energy Portfolio statute); *see also,* Opening Brief at ATT-10, n. 5).

33). E&ELegal offered evidence of a watt per watt shift from the coal-generated share of the market to the renewables-generated market. Doc. No. 180, pp. 7-8, SOF 33 (citing to U.S. Energy Information Agency state data). Colorado agrees with E&ELegal that the purpose of the RES is to displace coal. *See* Opening Br. 11-12. Colorado also admits that the RES "creates more demand for renewable energy and less for non-renewable energy in Colorado," Resp. Br. 20, and "may cause electricity generation to shift from coal companies to wind farms," Resp. Br. 48. Colorado itself describes the RES as "favor[ing] one product (renewable energy) over another (fossil fuels)…." Resp. Br. 45. Colorado thereby effectively—and repeatedly—concedes the basis of E&ELegal's standing.

Colorado also argues that "[t]his case is more akin to *Keyes v. School District No. 1*, 119 F.3d 1437 (10th Cir. 1997)." Resp. Br. 65. *Keyes* has nothing to do with the "opportunity to compete" for coal sales already manifest due to the RES. *Keyes* involved "[a] challenge to the district court's *dicta* concerning the future," *id.* at 1443 (emphasis added). In *Keyes* the Appellants "did not challenge an extant … policy." *Id.* at 1444. Here, by contrast, E&ELegal is challenging a Colorado statute that, since 2004, has operated to bar coal producers and generators from accessing an ever-increasing portion of the Colorado electricity market.

Colorado also argued that Alpha failed to offer evidence that it continues to

4

market to facilities in Colorado.  This is not true.  Alpha specifically stated "Alpha currently sells coal to electricity generating facilities in Colorado and intends to market to those facilities in the future." Doc. No. 101 ¶ 5. Further, federal documents show Alpha sells to facilities in other states that power the grid that services Colorado. Doc No. 194, pp. 3-4, SOF 2.  Nor can Alpha market its coal to generating facilities such as the Black Hills and PSCo units that have abandoned coal to facilitate compliance with the RES. Doc. No. 194 p.8, SOF 4.

The undisputed fact is that coal may not be used as the fuel source for up to 30% of the electricity market under the Colorado statute.  The statute causes a competitive injury this Court has previously recognized is the basis for standing.

## II.    The RES's Renewable Energy Mandate Necessarily Constitutes Either an Unconstitutional In-State Set Aside or Regulates Extraterritorially.

The central merits question before the Court is whether the Colorado RES has the "*practical effect* of … control[ing] conduct beyond the boundaries of the State."  *Healy v. Beer Inst*., 491 U.S. 324, 336 (1989) (emphasis added).[2]

It does.

---

[2] Colorado does not dispute that if the RES's renewable energy mandate is limited to in-state Colorado-qualified renewable-energy generation, it would constitute a *per se* invalid discriminatory in-state set-aside under *Wyoming v. Oklahoma*, 502 U.S. 437, 455-57 (1992) (requirement that Oklahoma generating plants burn 10 percent Oklahoma coal held to violate the Commerce Clause).  Colorado does not mention or address *Wyoming v. Oklahoma*.

Through regulations, the RES sets aside a portion of the interstate market for electricity and limits who may participate in that submarket. *See* C.R.S. 40-1-124(1)(c)(I) ("the electric resource standards shall require each qualifying retail utility *to generate, or cause to be generated*, electricity from eligible energy resources") (*emphasis added*).[3] This is the renewables quota Colorado utilities must meet. The practical effect of the RES is to restrict the means companies may use to produce electricity to meet this set-aside quota, regardless as to where the company operates or whether the electricity actually generated even enters Colorado.

Note with care, to meet its electricity needs, the utilities have had to purchase electricity from out-of-state suppliers (Aplt.App-160)) and have had to use out-of-state renewable power to meet the RES quota. *See* Aplt.App-165 ¶ 14. Please note also that Defendants "admit that regulated Colorado utilities can and do comply with the RES using RECs from both in-state and out-of-state renewable energy generation." *Id*. at 204. This admission proves the extraterritoriality of the RES, to wit, the RES specifies the production processes an out-of-state electricity generator must use to produce electricity (or renewable energy credits) that Colorado retail utilities must purchase to meet their RES quota.

---

[3] *E.g.*, in 2012, an amount of electricity equivalent to twelve (12) percent of the amount of its retail electricity sales in Colorado. C.R.S. 40-2-124(1)(c)(I)(C).

A further practical effect of the RES is that it blocks non-Colorado-qualified electricity generators, such as coal-fired power plants, from the set-aside portion of the market.  This, too, is an extraterritorial regulatory effect.  Indeed, Colorado does not dispute that displacing in-state (and wholly out-of-state) coal electricity generation is a core purpose of the RES.  *See* Aplt.App-220 ¶8 (¶ 8 not denied at Aplt.App-230).

Appellee Colorado mistakenly asserts that because the RES is enforceable only against in-state utilities, the RES cannot violate the per se bar against extraterritorial regulation.  *See* Resp. Br. 12. The RES, however, "causes," *i.e.*, forces, Colorado-qualified "renewable energy" generation produced in other States to meet Colorado's terms.  *See* C.R.S. § 40-2-124(1)(c)(I), (1)(c)(V), (1)(c)(V.5). The RES's plain language makes clear that the statute's Renewable Energy Mandate is the but-for cause of this Colorado-qualified renewable-energy generation *in other States*.

However, the dormant Commerce Clause prohibits "application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State…." *Healy*, 491 U.S. at 336.  The mere fact that Colorado's RES uses Colorado-utilities' electricity sales as an "in-state hook to affect out-of-state conduct" does not provide constitutional justification or authority for Colorado to "*effectively*" regulate out-of-state

electricity generation.  *See Pharm. Research & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 69 (D.D.C. 2005).  That the RES is triggered by utilities' retail sales in Colorado "is irrelevant" because "the practical effect of the law is to control" wholly out-of-state commerce.  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986).

Colorado also argues that the RES does not violate the dormant Commerce Clause because "the RES only affects out-of-state companies that choose to enter into commercial transactions with Colorado utilities." Resp. Br. 16.  This, too, is irrelevant.  Colorado is not allowed to condition access to a portion of the interstate electricity market "on conduct that occurs in" other States or nations.  *See, e.g., National Foreign Trade Council v. Natsios*, 181 F.3d 38, 69 (1st Cir. 1999).  Nor can Colorado "save its law by protesting that a company" generating non-Colorado-qualified electricity "can simply forgo contracts with" Colorado utilities.  *See id.* at 70.

Colorado cites this Court's decision in *Quik Payday, Inc. v. Stork*, 549 F.3d 549 (10th Cir. 2008), for the proposition that a State statute does not regulate extraterritorially so long as it "involves" in some way an in-state business or activity.  *See* Resp. Br. 19.  To support this claim, Colorado fundamentally misinterprets fact-specific dicta from *Quik Payday*.  This is not the applicable law.

First, the Supreme Court has made clear that even in cases where a party to a

8

commercial transaction is in-state, a State statute may nonetheless impermissibly control wholly out-of-state commercial activity. For example, *Baldwin,* 294 U.S. 511 (1939), involved "a milk dealer in the city of New York," which purchased milk from Vermont. 294 U.S. at 518; *see also Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. at 580 ("mere fact" that effects of state law "are triggered only by" in-state sales does not validate the law if it regulates the out-of-state transactions" of companies that sell in-state).

Second, unlike this case, the Kansas statute at issue in *Quik Payday* regulated the "payday" loan transactions in Kansas, *see Quik Payday*, 549 F.3d at 1308, *not* wholly out-of-state commercial activity such as electricity generation, including in cases where the electricity never even enters Colorado's borders.

Colorado also admits the RES is Colorado's way of attempting to reduce perceived air pollution *in other states* by displacing coal-fired electricity generation *in other states* even where the out-of-state electricity so generated is never used in (and never enters) Colorado. Resp. Br. 6 n.5.[4]

---

[4] Of course, Colorado is not allowed to regulate air pollution allegedly occurring in other states. *See EPA v. EME Homer City Generation, L.P.* 134 S. Ct. 1584, 1593 (2014) (noting that Congress added a "Good Neighbor Provision" to the federal Clean Air Act because "States … lack authority to control" out-of-state air pollution); *see also Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) ("Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas

As cited above, Colorado agrees that the Renewable Energy Mandate is designed to reduce the use of coal for electric generation, even where such generation occurs in other States.  They admit that this has nothing to do with the quality or physical properties of the good at issue, electricity: "While the electricity itself is identical, the environmental, economic, and other impacts from *generating* that electricity differ greatly depending on the source." Resp. Br. 7 n.6 (emphasis in original).  Colorado does not dispute the lower court's finding that when the RES forces Colorado-qualified renewable generation to occur in *other states*, this forces non-Colorado-qualified generation off of the grid, *see* Aplt.App-244, even though the "actual electricity … may never enter Colorado."[5]  Resp. Br. 6 n.5.

The RES Mandate thus has the prohibited practical effect of controlling wholly out-of-state conduct to force Colorado's policy goals beyond Colorado's borders, an act expressly prohibited by *Baldwin*.  *Baldwin*, 294 U.S. at 524 ("One state may not put pressure … upon others to reform their economic standards. If farmers or manufacturers in Vermont are abandoning farms or factories, or are failing to maintain them properly, the legislature of Vermont and not that of New

_____

emissions…. These sovereign prerogatives are now lodged in the Federal Government[.]""").

[5] Colorado acknowledges, as it must, that "electrons on the electricity grid cannot be precisely controlled and tracked…." Resp. Br. 32 n.12.

York must supply the fitting remedy.").

In light of the above, the RES is unconstitutional.  The RES Mandate does not further any legitimate State interest in controlling the quality of goods imported into Colorado.  Colorado is "without power to prohibit the introduction within her territory of" electricity "of wholesome quality acquired in" other States. *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. at 521.  Colorado does not dispute that it may not require out-of-state electricity generators to pay their workers a given wage as a condition of accessing Colorado's electricity market.  *Id.* at 524.  The Renewables Quota is no different.

Relying primarily on *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), Colorado argues that its RES only creates an "incentive" (Resp. Br. 19-23) but also admits it is a "mandate" (Resp. Br. 4). Such a mandate impermissibly imposes a "penalty." Colorado's incentive argument falls prey to Supreme Court and Tenth Circuit precedent, a point E&ELegal has already addressed. *See* Opening Brief at 34 & 45-50.

Colorado suggests that *North Dakota v. Heydinger*, No. 11-cv-3232, 2014 U.S. Dist. LEXIS 53888 (D. Minn. 2014), does not support E&ELegal's dormant Commerce Clause claim because only Colorado utilities are subject to *liability* under the RES.  *See* Resp. Br. 32-33. But dormant Commerce Clause analysis turns on a law's practical consequences.  *Healy*, 491 U.S. at 332.  And a State statute

that does not directly subject out-of-state entities to liability may still have the prohibited practical effect of regulating extraterritorially. *See, e.g., Brown-Forman Distillers Corp. v. New York State Liquor Auth.,*476 U.S. at 583; *and see National Foreign Trade Council v. Natsios*, 181 F.3d at 69-70.

Colorado also suggests that the RES should be upheld because numerous states have RES-like statutes. *See* Resp. Br. 36. The number of states with similarly unconstitutional statutes is irrelevant. *See, e.g., Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. at 576 & n.1 (invalidating extraterritorial state statute notwithstanding that 39 other states had similar statutes).

Colorado suggests that the preamble of a recent EPA proposed rule cures the RES's constitutional infirmities. *See* Resp. Br. 36. Colorado's reliance on EPA is misplaced. The Courts, and not the Executive, determine what is or is not constitutional. U.S. Const. Art. III Sec. 2. Further, the legality of the EPA proposal is at issue and is now before the U.S. Court of Appeals for the D.C. Circuit on a writ of prohibition (*In re Murray Energy Corp.,* No. 14-1112), and EPA has been ordered to justify its position. The D.C. Circuit not having decided the matter, Colorado cannot rely on EPA's mere assertions on that regulatory proposal's constitutionality.

Colorado also suggests that inapposite FERC orders give it authority to

12

regulate GHG emissions in other States. *See* Resp. Br. 37. Neither the Supreme

Court nor FERC take that position.[6]

Finally, Colorado claims that the RES should be upheld because E&ELegal

failed to offer evidence of the RES's extraterritorial regulation. Resp. Br. 33. The

evidence of extraterritorial regulation is plain on the face of the statute. Further,

E&ELegal proffered evidence of this extraterritorial effect in its Movant's

Statement of Material Facts (ECF 180 ¶¶ 14&17; *see* Aplt.App-167) and Colorado

admitted to the truth of such extraterritorial effect in its Response (ECF 189 ¶¶

14&17; Aplt.App-203-04).

### III.    The Scope and *Stare Decisis* of the Extraterritoriality Doctrine is not in Question.

Colorado claims that the dormant Commerce Clause's categorical bar

against extraterritorial regulation is limited to price-affirmation statutes, suggesting

that *Baldwin*, *Brown-Forman* and *Healy* are inapplicable. Resp. Br. 26-27 (*citing*

*to Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)).

---

[6] FERC Order 888 concerns State authority to regulate purely in-state electricity
generation. *See New York v. FERC*, 535 U.S. 1, 24 (2002) ("FERC has recognized
that States retain significant control over local matters…. Congress left to the
States authority to regulation generation and transmission *siting*." (citing Order No.
888, at 31,782, n.543) (emphasis added)). FERC Order No. 1000, 136 FERC ¶
61,051 (2001), is policy neutral and simply acknowledges the practical burdens
statutes like the RES will have on interstate commerce, *see id.* at ¶¶ 29, 39, 45, 82,
497.

E&ELegal refuted this categorically. Opening Br. 30, 42-43 & fn. 24 & 29.

Because the Ninth Circuit has patently ignored Supreme Court precedent on this

issue[7], however; because there is a clear split both within the Ninth Circuit[8] and

amongst jurists[9], and because the Ninth Circuit precedent conflicts with the Tenth

Circuit precedent[10], E&ELegal offers a more complete discussion on *stare decisis*

and the scope of the extraterritoriality doctrine.

### A.    The Supreme Court has not reversed or narrowed the *stare decisis* of the Extraterritoriality Doctrine.

E&ELegal asks this Court to adhere to precedents and to not unsettle things

which are established (*stare decisis et non quieta movere*). Only the Supreme

Court has the authority to disturb settled law and when they want to, they know

how.

Chief Justice Roberts has explained that "if the precedent under

consideration itself departed from the Court's jurisprudence, returning to the

'intrinsically sounder' doctrine established in prior cases may 'better serve the

values of *stare decisis* than would following the more recently decided case

inconsistent with the decisions that came before it.'" *Citizens United v. FEC*, 558

---

[7] *Association des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937 (9th Cir. 2013).
[8] *Rocky Mountain v. Corey*, 740 F.3d 507, 519 (9th Cir. 2014).
[9] *American Beverage Ass'n v. Snyder*, 735 F.3d 362 (6th Cir. 2012).
[10] *ACLU v. Johnson*, 194 F.3d 1149, 1160-1161 (10th Cir. 1999).

U.S. 310, 378 (2010) (*internal citations omitted*). Conversely, the Chief Justice explains that "*stare decisis* does not control when adherence to the prior decision requires 'fundamentally revising its theoretical basis.'" *Id.* at 379 (*citing to Montejo* v. *Louisiana,* 556 U.S. 778, 792 (2009)).  There is no reason to revise the theoretical basis of the extraterritoriality doctrine and precedent, and no need to narrow or dispose of it.

The Ninth Circuit argues that in *Walsh* "the Court has held that *Healy* and *Baldwin* are not applicable to a statute that does not dictate the price of a product" (*Association des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d at 951) and thus the *Healy-Baldwin* extraterritoriality doctrine can no longer be extended beyond price control statutes, as was (and remains) the Court's long-standing precedent. *See, infra*.

Nowhere in *Walsh*, however, did the Court indicate that it was narrowing its extraterritoriality scope to only price control statutes.  *See North Dakota v. Heydinger*, No. 11-cv-3232, 2014 U.S. Dist. LEXIS 53888, *52 n. 12 (D. Minn. 2014) ("The fact that the [*Walsh*] Court limited its comparisons to prior price control statute cases does not mean that its other extraterritoriality cases are no longer valid."); *see also Rocky Mt. Farmers Union v. Corey*, 740 F.3d 507, 519 n.7 (9th Cir.2014) (Smith, J., dissenting from denial of rehearing en banc) ("[N]othing in Walsh repudiates the principle that a state may not close its borders to out-of-

15

state goods unless exporters alter their out-of-state conduct.").  Rather, it is an example of the Supreme Court following its common practice of writing narrow decisions.

In *Walsh*, the Court had before it a statute requiring manufacturers to negotiate "rebate agreement" with Maine or submit to "prior authorization" before marketing their drugs within the *Maine*. 538 U.S. at 658-59.[11] The statute did not in any way penalize pharmaceutical manufacturers for out-of-state business practices. *Id.* at 669. As a result, the Court easily concluded that the statute was a classic regulation of in-state business activity — as distinct from the statutes in *Healy*, which the Court cited by way of example. *Id*.

As the Chief Justice has explained:

[W]hile it is true that 'if it is not necessary to decide more, it is necessary not to decide more,' sometimes it *is* necessary to decide more. There is a difference between judicial restraint and judicial abdication. When constitutional questions are 'indispensably necessary' to resolving the case at hand, 'the court must meet and decide them.'"

*Citizens United v. FEC*, 558 U.S. at 375.  In *Walsh* the court did not need to decide more than it did (hence focusing only on the context of a statute that did not regulate out-of-state business practices) and thus did not decide more, and did not address the scope of the *Healy-Baldwin* doctrine.  Nothing in *Walsh* confines

---

[11] The law at issue in *Walsh* did not even purport to condition the sale of the manufacturers' drugs on how they were produced outside the state.

16

*Healy* to its facts, let alone overrules *sub silentio* two centuries of jurisprudence limiting States to their territories.  For this reason, multiple post-*Walsh* courts have applied *Healy* to strike down extraterritorial state statutes, e.*g., Heydinger* and *Snyder*.

In the instant case, this Court faces an extraterritoriality claim that does not involve price controls.  Under the principle of *stare decisis*, this Court must harken back "to the intrinsically sounder doctrine established in prior cases" (*Citizens United*, 558 U.S at 378) and leave to the Supreme Court any future decision on whether to narrow its extraterritoriality doctrine that it might wish to make.

Notably, the Supreme Court will not narrow the doctrine unless it finds there is a need to "fundamentally revis[e] its theoretical basis."  *Id*. at 379.  Neither the Ninth Circuit nor Colorado has offered even the barest suggestion that the theoretical basis for extraterritoriality doctrine has fundamentally changed.

The Court created the doctrine to protect two sovereigns.  Where the federal government has not occupied a regulatory arena, but conflicting state regimes demonstrate that only a federal approach or a non-regulatory approach will adequately protect interstate commerce, the extraterritoriality doctrine strikes the state regimes and protects the prerogatives of the federal legislature.[12]  *See*, *e.g. S.*

---

[12] E&ELegal argued that the complexity of the electrical grid is not served by multiple state definitions of "renewable energy" and this Court is free to find that

*Pac. Co. v. Arizona*, 325 U.S. 761, 775 (1945). And, where one state's regulatory

schema tramples another state's sovereignty, *e.g.*, *Edgar v. Mite Corp*., 457 U.S.

624, 641-43 (1982), the doctrine strikes the offending statute, protecting the

sanctity of each state's own authorities.

It is the latter purpose that is dominantly at issue in this case. Protection of

state sovereignty remains an important protection to states as demonstrated by the

*amici curiae* brief supporting Petitioners' Petition for a Writ Of Certiorari and

opposing California's extraterritorial regulation of goose liver, filed by the

Attorneys General of Nebraska, Alabama, Georgia, Iowa, Kansas, Missouri,

Montana, North Dakota, Oklahoma, South Carolina, South Dakota, West Virginia

and Wyoming. *Association des Éleveurs de Canards et d'Oies du Québec v.

Harris*, No. 13-1313, *available at* http://sblog.s3.amazonaws.com/wp-

content/uploads/2014/06/2014.05.30-Amicus-Brief.pdf (accessed Oct. 14, 2014).

Further, the refusal of the Supreme Court to grant writs of certiorari has a

small tale to tell regarding *stare decisis*. The Court has denied cert in the Ninth

Circuit cases. It is not possible to suggest that this is an endorsement of a

---

an independent basis for granting Appellants relief. This doctrine applies even in
the absence of a showing of actual conflict. For example, in *Healy*, there was no
actual conflict at issue, yet the Supreme Court noted that it had to consider "what
effect would arise if not one, but many or every, State adopted similar legislation."
491 U.S. at 336.

narrowing of the extraterritoriality doctrine.  Each of those cases was decided in preliminary motions.  In one case, discovery had not even started.  Each were returned to the trial court for further consideration of potentially dispositive issues. It has long been the Supreme Court's practice to not accept cases when they may be resolved on other basis and without reaching the constitutional question presented in the writ.

There is, however, a Sixth Circuit case that stood in a different procedural status from the Ninth Circuit cases and where the decision to deny cert speaks more loudly.  In *American Beverage Ass'n v. Snyder* the Sixth Circuit held the extraterritorial doctrine does apply beyond price control statutes.  In a unanimous decision, the panel invalidated the extraterritorial statute and ended the merits portion of the case.  In a concurring opinion, Judge Sutton offered some skepticism about the extraterritoriality doctrine (*American Beverage Ass'n v. Snyder* 735 F.3d at 377) and the Michigan defendants used that skepticism as the basis for seeking a writ of certiorari, presenting the question of whether the doctrine should be abolished.  With the merits of the case fully resolved, the only question before the Supreme Court was whether they wished to narrow or otherwise abolish the extraterritorial doctrine.  They declined to entertain the issue, despite the clear split between the Ninth and Sixth Circuits.  *See, American Beverage Ass'n v. Snyder*, 134 S. Ct. 61, 187 L. Ed. 2d 26 (2013).  As a result, *stare decisis* controls and

19

E&ELegal argues this Court must continue to apply the extraterritorial doctrine to non-price-control issues as it has in the past and as has the Sixth and Seventh Circuits, as discussed below.

### B. The Scope of the Extraterritoriality Doctrine Reaches Beyond State Price Control Regulation.

E&ELegal reiterates its recitation of cases where the Supreme Court has applied the dormant Commerce Clause's bar on extraterritorial regulation in a wide variety of contexts. *See, e.g., S. Pac. Co. v. Arizona*, 325 U.S. 761, 779-84 (1945) (state statute regulating train lengths constitutes unconstitutional extraterritorial regulation where "practical effect of such regulation is to control train operations beyond the boundaries of the state"); *BMW of N. Am. v. Gore*, 517 U.S. 599 (1996) (invalidating state statute prohibiting selling repainted cars without disclosing that car had been repainted because repainting could have occurred in a different state); *Bibb v. Navajo Freight Lines, Inc*., 359 U.S. 520 (1959) (invalidating state statute requiring certain type of mudguard on semis because other states allowed different mudguards and one state actually required a different type of mudguard); *Edgar v. Mite Corp*., 457 U.S. 624, 641-43 (1982); *see Healy*, 491 U.S. at 333-337 & ns. 9 & 14.  This Court has too. *See ACLU v. Johnson*, 194 F.3d at 1160-1161 (statute regulating Internet regulates extraterritorially); *accord Am. Bev. Ass'n*, 700 F.3d at 810 (applying *Healy* and *Brown-Forman* to "novel issue of an 'unusual extraterritoriality question'"); *and see*, *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,

63 F.3d 652, 659 (7th Cir. 1995) ("Although cases like *Healy* and *Brown-Forman* involved price affirmation statutes, the principles set forth in these decisions are not limited to that context .").

Colorado does not and cannot cite to a single Supreme Court decision that states that it has restricted the scope of extraterritoriality jurisprudence of the kind adjudicated in the above cited cases.

## IV.    The RES is Discriminatory and harms Interstate Commerce

A ***reduction*** in the overall size of an interstate market is a burden on commerce. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (discrimination exists where "a share of the entire supply will not be promptly replaced") *and see*, *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1042-43 (10th Cir. 2009). ("he would still need to show a discriminatory effect upon interstate commerce in attorney-trustee services ***as a whole***.") (*emphasis added*).

The purpose, intent and practical effect of the RES is to reduce the amount of coal-based electric generation. The court below found that the RES is a direct cause of a reduction in the in the interstate market for thermal coal as a whole, a fact Colorado has already admitted. ECF 187 p. 6-7 (¶ 33). The practical effect of the RES is "a discriminatory effect upon interstate commerce" caused by "a share of the entire supply [not being] promptly replaced;" *quod erat demonstrandum*.

## V.    *Pike* Balancing was Premature

E&ELegal's First and Second Claims seek judgment and relief on the basis
that the RES is "unconstitutional, invalid and unenforceable under the dormant
Commerce Clause."  ECF No. 163. E&ELegal prevails on these claims if the RES
is either a facial dormant Commerce Clause violation or, alternatively, fails the
*Pike* test for facially neutral statutes.  The only Claim 1&2 question E&ELegal
raised below was that of extraterritoriality and its default alternative, an in-state
preference. ECF No. 180.  The only arguments Colorado cross-claimed in their
motion were that the RES does not discriminate against interstate commerce and
that there is no burden on interstate commerce.  These arguments are merely the
first prong of a *Pike* test.  Neither party raised, argued or presented evidence with
regard to the second prong, whether "the burden imposed on such commerce is
clearly excessive in relation to the putative local benefits."[13]

The Court below erred by examining the second prong of the *Pike* test *sua
sponte*, ignoring the discovery and briefing schedule upon which the parties were
required to rely. The Magistrate's scheduling order bifurcated motions practice on
facial violations and consideration of *Pike* balancing.

Under Judge Martinez' Practice Standards, parties are permitted to file
"early motions for summary judgment."  These are in addition to filing regular

---

[13] *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)

Rule 56 motions for summary judgment.  The former, addressing the facial

violations, were to be filed approximately 6 months before the latter, addressing

the non-facial (*Pike*) questions.  *See* ECF Nos. 149 & 151. As Colorado argued to

the court below, it would file its early motion on facial violations before

completing merits discovery needed for *Pike* balancing. [14] ECF No. 178.  All

parties planned to file fact-based merits-related Rule 56 motions for summary

judgment based on completed discovery.  In their early motion on Claims 1 & 2,

Colorado never made a *Pike*-balancing argument, never presented any evidence

needed to support a *Pike* balancing and never argued that the balance swayed

toward the constitutionality of the statute.  Under F.R.C.P Rule 56(d), the court

below could defer considering the *Pike*-balancing issue, which it should have done

since that issue was not before the court in the first place. Alternatively the court

could have extended or stayed the deadlines on summary judgment on the *Pike*-

balancing issue, which the Magistrate judge had already done (ECF No. 213) but

which the District Court ignored.  What Rule 56 does not allow is disposition of

the entire case through summary judgment when neither side had completed

_____

[14] In their statement of defenses, Colorado stated "Defendants plan to demonstrate
the many well-documented benefits of the RES, such as reducing air pollution and
greenhouse gas emissions, creating jobs, and protecting the environment.
Addressing each of these alleged burdens and benefits is expected to require
extensive expert witness and fact discovery under *Pike*."  ECF No. 149 at p. 10.

discovery on the balancing issues, much less addressed them in filings before the court below. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250 ("Rule 56[d] [requires] that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.").

Colorado contorts the Rule 56(d) issue by suggesting that once all discovery had ended, E&ELegal should have supplemented its summary judgment response, citing to *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1108 (10th Cir. Colo.2009). But the facts and procedural posture in this case dismember Colorado's argument. Alpine specifically states this Court "can affirm [a motion for summary judgment] on any ground *supported by the record*, so long as the appellant has 'had a fair opportunity to address that ground'" (*emphasis added*). In *Alpine* "the Hubbells had already placed evidence into the record and made no attempt to provide the district court with additional evidence from the new depositions that would support their opposition to summary judgment." *Id*. At 1114. But, in this case, Colorado never placed the *Pike* issues before the court nor placed into the record any evidence regarding any putative local benefit; and thus E&ELegal never had a fair opportunity to address that ground. Indeed, if E&ELegal had made its *Pike* burden arguments (and 250 RES-caused premature deaths a year is weighty evidence that Colorado unable to outbalance with concern for a few miles of increased water quantity), Colorado would have cited to *Alpine* for its lack of opportunity to make

24

its *Pike* arguments, not having made them in their own motion.  In light of the

Magistrates scheduling order, the failure of Colorado to argue the *Pike* balancing

elements and the inappropriate application of *Alpine*, the court below far exceeded

its authority under Rule 56(d) and "clearly erred or ventured beyond the limits of

permissible choice under the circumstances." *Hancock v. Am. Tel. & Tel. Co., Inc.,*

701 F.3d 1248, 1262 (10th Cir. 2012) (quoting *Wright ex rel. Trust Co. of Kan. v.*

*Abbott Lab., Inc.,* 259 F.3d 1226, 1233 (10th Cir. 2001)), *cert. denied*, 133 S. Ct.

2009 (2013).

## CONCLUSION

For the foregoing reasons, E&ELegal respectfully requests that this Court

reverse the district court's order granting the Defendants' motion for summary

judgment and denying E&ELegal's motion for summary judgment, grant

E&ELegal's Early Motion for Partial Summary Judgment on Claims 1 & 2, and

grant costs and fees as sought in its Second Amended Complaint.

Respectfully submitted,

*/s/ David W. Schnare*
David W. Schnare
Free Market Environmental Law Clinic
9033 Brook Ford Rd.
Burke, VA 22015
schnare@fmelawclinic.org
571-243-7975

/s/ *Michael D. Pepson*
Michael D. Pepson
14108 Flint Rock Terrace
Rockville, Md 20853
Michael.D.Pepson@gmail.com
301-980-2693

Attorneys for Appellants
E&ELegal and
ROD LUECK

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 5,921 words, not including those elements excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

I relied on my word processor to obtain the count and it is Word Version 2010:

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonably inquiry.

By:    */s/ David W. Schnare*
David W. Schnare
Free Market Environmental Law Clinic
9033 Brook Ford Rd.
Burke, VA 22015
schnare@fmelawclinic.org
571-243-7975

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing **APPELLANT'S REPLY BRIEF**, as submitted in Digital Form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses by Norton Internet Security and, according to the program, is free of viruses. In addition, I certify all required privacy redactions have been made.

By:      */s/ David W. Schnare*
David W. Schnare
Free Market Environmental Law Clinic
9033 Brook Ford Rd.
Burke, VA 22015
schnare@fmelawclinic.org
571-243-7975

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **APPELLANT'S REPLY BRIEF** was served to the following through the Electronic Filing System on the 14th day of October, 2014.

William Allen
Office of the Attorney General for
the State of Colorado
Ralph L. Carr Colorado Judicial
Center
1300 Broadway
Denver, CO 80203
Direct: 303-866-5325
will.allen@state.co.us

Michael Freeman
Earthjustice Legal Defense Fund
633 17th Street
Suite 1600
Denver, CO 80202
303/623-9466
mfreeman@earthjustice.org

Neil Levine
Neil Levine Law Offices
4438 Tennyson Street
Denver, CO 80212
303-455-0604
nlevine@grandcanyontrust.org

John E. Putnam
Kaplan Kirsch & Rockwell
1675 Broadway, Suite 2300
Denver, CO 80202
303-825-7000
Email: jputnam@kaplankirsch.com

By:     */s/ David W. Schnare*
David W. Schnare
Free Market Environmental Law Clinic
9033 Brook Ford Rd.
Burke, VA 22015
schnare@fmelawclinic.org
571-243-7975

29